Laramore, Judge,
delivered the opinion of the court;
Lynch Brothers, Incorporated,[1] (hereinafter called Lynch or plaintiff), was the low bidder on a contract with defendant through the Navy Department Aviation Supply Office, for the furnishing of some 10,135 fuel tanks, for use on various aircraft, at the unit price of $113.67 or a total of $1,152,045.45. The contract was awarded to plaintiff on April 13, 1950, and was terminated for default by the contracting officer on October 24, 1950, on the ground *607 that plaintiff had so failed to make progress as to endanger performance of the contract.[2]
The contract provided for desired delivery dates, the first being 120 days after date of the contract and continuing at intervals, the last being 381 to 410 days after the date of the contract.[3] The contract also provided for the furnishing by the govermnent of a substantial amount of defendant-owned tooling and dies.[4] At the time the instant contract was awarded to plaintiff, this government-owned equipment was located at the plants of three government contractors who were producing for defendant the same type of tanks *608 which plaintiff was to supply. Under the contract, the tooling and dies were to be delivered by defendant to plaintiff at or near plaintiff’s plant in Pine Meadows, Connecticut, for use in connection with the work to be performed. The contract did not specify any particular dates upon which delivery of the tooling and dies were to be made. However, it contained a clause which provided for an equitable adjustment under the “Changes” provision of the contract in case that the tanks could not be produced without the government-furnished material.[5] There is no dispute in this case that the tanks could not be produced without the government-furnished tools and dies and this fact was known by the plaintiff and defendant. As stated earlier, at the time the contract was awarded to the plaintiff, a vast majority of the necessary tooling was still in use by the various government contractors. Plaintiff was completely unaware of this, although this fact was known to defendant. It was not until July that the last of the necessary tooling was delivered to plaintiff — almost four months after the contract was entered into.
In this case, plaintiff seeks to recover $76,496.11,[6] as compensation for the wrongful termination for default by defendant of its contract.[7] Plaintiff contends that its inability to perform the contract stems from the fact that defendant unduly delayed in delivering the government-owned tooling and dies to be used as government-furnished materials in connection with the work to be performed under the contract. Consequently, plaintiff, in effect, argues that since its inability to perform under the contract is due to causes beyond its control, the termination for default is to be converted pursuant to paragraph (g) of section 15 of the contract into a *609 “Termination at the Option of the Government” [8] and, as such, it is entitled to recover what amounts to termination costs.[9] Defendant, on the other hand, contends that even if there was an imreasonable delay on the part of the government (which it denies) plaintiff’s failure to perform under the contract does not stem from the alleged delay but ivas attributable to its inability to obtain the necessary financing which in turn was due to its poor financial position. To this plaintiff replies that its inability to get the necessary financing was due to the worsening of its financial position occasioned by the government’s failure to supply the necessary tooling, since during this period the plant was practically idle, resulting in unproductive overhead. Defendant has asserted a counterclaim to recover its excess costs incurred by reason of the repurchase of the contract.
There are certain factors present in this case which clearly bring into focus the legal and factual questions which, we think, are controlling in this case. It is clear from the entire record that at the time defendant terminated plaintiff’s right to proceed under the contract for default, plaintiff was not in a position to complete performance under the contract.[10] It is also clear that plaintiff’s inability to perform under the contract was ultimately due to its failure to obtain the neces *610 sary financing.[11] However, it is equally clear to us as plaintiff contends that defendant unreasonably delayed in delivering the government-famished material without which plaintiff could not start production under the contract. In this respect we note that the government did not supply plaintiff with all of the necessary tooling until four months after the contract was awarded to plaintiff, although on repeated occasions plaintiff notified defendant that it needed prompt delivery of the tooling. Defendant knew or should have known that the necessary tooling would not be available within a reasonable time after the contract award, since this same tooling was still in use by the other government contractors. Furthermore, the defendant has not shown any outside intervening factor which prevented it from a prompt delivery. Under such circumstances, we think that defendant negligently failed to famish the required materials in time so that plaintiff could economically perform the contract. This, we think, constitutes a breach on the part of the government of its obligation under section 25 of the contract. See Peter Kiewit Sons’ Co., Inc. v. United States, 138 Ct. Cl. 668, 674-675, 151 F. Supp. 726, 731 (1957) and cases cited therein.[12] Cf. Commerce International Co., Inc. v. United States, this day decided ante, p. 529. The defendant cannot cure its breach here by the simple expedient of extending the time of delivery.- William Cramp & Sons v. United States, 41 Ct. Cl. 164 (1906) reversed on other grounds, 206 U.S. 118 (1907). Whether it constitutes a material breach converting the termination for default to *611 one for convenience, depends on whether or not plaintiff was ready, willing and able to perform the contract when the breach occurred. See Donnell-Zane Co. v. United States, 75 Ct. Cl. 368 (1932); Brundage v. United States, 66 Ct. Cl. 708 (1929). The answer to this, we think, depends on whether or not plaintiff could have obtained the necessary financing at the time the alleged breach occurred.
The financial ability and capacity of a contractor to perform a government contract is generally a matter within his control and responsibility. Therefore, inadequate financial resources which lead to a default in performance of the contract do not generally excuse nonperformance and as a result the government is absolved of any liability under the contract. See McBride & Wachtel, Government Contracts, § 36.20. However, financial ability to perform a government contract does not mean that the contractor must have on hand adequate cash to pay for the entire cost of performance. Nor can we require the small government contractor to have at its disposal the same financial resources as the giant industrial institution. We think the contractor must have available at the time of the contract award reasonable financial resources in the light of business custom and practice either on hand or through its customary lines of credit, to finance the expected cost of production. See Appeal of West Coast Lumber Corp., ASBCA 1131, 6 C.C.F. 61477 (1953).
At the time the contract was entered into plaintiff’s financial position was weak. Without a very substantial loan, it would have been impossible for plaintiff to perform the contract in suit. Plaintiff was aware of 'this and during the months prior and subsequent to the awarding of the contract, plaintiff sought financial assistance from various lending institutions. Defendant was also aware of plaintiff’s financial position and knowing this, nevertheless, awarded the contract to the plaintiff. The Bristol Bank and Trust Go., plaintiff’s source of financing on prior occasions, stated, in a letter to the Navy, that it would arrange to make the necessary funds available to plaintiff. The Bank’s vice-president, who also represented the Bank *612 on plaintiff’s board of directors, testified that the bank was ready to make the necessary funds available to plaintiff. He testified further that the bank declined to finance the instant contract because of the delays by defendant in delivering the tooling, causing plaintiff’s plant to become and to remain virtually idle during this period which in turn aggravated plaintiff’s already precarious financial position.
Defendant would have us ignore this testimony. It argues that plaintiff’s failure to obtain the necessary financing did not stem from the government delay but was attributable to plaintiff’s poor financial position. Defendant in support of this contention has introduced into the record financial statements of plaintiff showing that at the time the subject contract was awarded to plaintiff, it had a deficit of current assets over current liabilities.[13]
As stated earlier, there is no doubt that plaintiff’s financial position was very strained. However, plaintiff has introduced testimony from a bank official that in spite of this the bank was willing to make the necessary funds available to plaintiff. There are certain factors in the record which seem to buttress this testimony. The bank officer, on cross-examination, indicated that the type of financin'g which was contemplated was based on the assignment of the government contract to the bank. He stated that in this type of security arrangement the bank looks more to the ability of the contractor to perform the contract, rather than the applicant’s financial position. The record discloses that plaintiff’s physical facilities were more than adequate to perform the contract. Defendant itself confirmed this on its pre-award survey of plaintiff’s plant. Moreover, immediately after the contract award, plaintiff enlarged and adapted its *613 physical facilities to the expected government equipment. The bank official further testified that in determining the contractor’s ability to perform the contract, the bank looked to see if the subject contract was adequately bonded. The record discloses that the Hartford Accident and Indemnity Company furnished a $200,000 performance bond to defendant conditioned upon the faithful performance of the contractor. He indicated that this factor would counteract the detrimental effect of the deficit in. plaintiff’s financial position.
It is apparent to us from the entire record that at the time of defendant’s breach the bank was willing to make the necessary funds available to plaintiff in spite of the fact of plaintiff’s strained financial position. Moreover, because of the nature of the security arrangement, the bank had to have assurances that the performance of the contract could be started before it could enter into the loan arrangement. When defendant failed to deliver the necessary tooling on time, the bank declined to make the necessary funds available. This in turn caused plaintiff’s default. Consequently, we must find that plaintiff’s default was from causes beyond its control or negligence, and as a result the termination for default is to be converted into a “Termination at the Option of the Government” pursuant to paragraph (g) of section 15 of the contract. See Appeal of Facs Products, Inc., ASBCA Nos. 3386 and 3601, 57-1 BCA 1215 (1957). Accordingly, judgment is entered for plaintiff in the amount of $76,496.11. Defendant’s counterclaim is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and. the briefs and argument of counsel, makes findings of fact as follows:
1. Lynch Brothers, Incorporated, was incorporated, under the laws of the State of Connecticut, on or about December 21, 1945. By amendment to its charter, on or about March 23, 1953, its corporate name was changed to The Litchfield Manufacturing Corporation. The duration of such corporation was, by amendment to its charter, terminated on July *614 29, 1955. The assets of such corporation were on such date transferred subject to its liabilities to Holly Corporation, a Delaware corporation, the sole stockholder of The Litchfield Manufacturing Corporation, in complete liquidation of the latter.
2. Lynch Brothers, Incorporated (hereinafter called Lynch or plaintiff), entered into a contract, No. N383s-33503, dated April 13,1950, with the defendant, through the Navy Department Aviation Supply Office, Philadelphia, Pennsylvania, for the furnishing to defendant by plaintiff of some 10,135 tanks, external auxiliary fuel, MK-12, for use on various aircraft, at the unit price of $113.61 or a total of $1,152,045.45, following submission of bid by Lynch under invitation for bids, No. 10,711, publicly opened on March 20, 1950.
3. On March 7, 1950, the Navy issued invitations for bids for the manufacture and delivery of 10,135 aluminum external auxiliary drop-type fuel tanks (MK-12). Pursuant to this invitation, Lynch, together with 12 other companies, submitted bids and, as indicated in the following bidders’ list, Lynch was the lowest bidder:
Company and Address Unit Price of Bid
Lynch Brothers, Inc. Pine Meadow, Connecticut $113.67
Engineering & Research Corp. 48 LaEayette Street Riverdale, Maryland 134.40
Firestone Tire & Rubber Co. 1200 Firestone Parkway Akron 12, Ohio 137.95
H. J. McGrath Co. 2501 Boston Street Baltimore,- Maryland 138.40
Fleetwood Airflow, Inc. Wilkes-Barre, Pennsylvania 138.73
Vic Pastushin Industries Los Angeles, California 139.64
Goodyear Aircraft Corp. 1220 Massillon Road Akron, Ohio 139.85
Curtiss Wright, Inc. Airplane Division Columbus, Ohio 148.47
*615 Company and Address Unit Price of Bid
Charles T. Brandt, Inc. 1700 Ridgely Street Baltimore, Maryland 149.68
Beech Aircraft Corp. Wichita, Kansas 149.73
Metcher Aviation Corp. W. Colorado & Pasadena Ave. Pasadena, California 172.04
Ryan Aeronautical Co. San Diego, California 223.42
United Aircraft Corp. Chance-Yought Div. Dallas, Texas 226.00
4. On March 30, 1950, pursuant to defendant’s request, the plaintiff, by telegram, extended the bid acceptance date by 15 days.
5. The Hartford Accident and Indemnity Company, as surety, with the plaintiff as principal, furnished a $200,000 performance bond to the defendant conditioned upon the faithful performance of the contract.
On June 2, 1959, the surety was served with a notice to appear in this case to assert any interest it might have in the subject matter of this suit. This action was taken pursuant to the defendant’s motion. The defendant did not move for issuance of a summons to the surety company to defend against the counterclaim which the defendant here asserts. No appearance herein was made by or on behalf of the surety company.
6. Pertinent provisions of the contract are as follows:
TOOLING CLAUSE:
(a) The Government owns the tooling listed in the attached Exhibit A, which is incorporated in and made a part of the invitation. To the extent indicated by Exhibit A, such tooling is available for inspection by prospective bidders and arrangements therefor may be made upon contacting the Bureau of Aeronautics Kep-resentative at Columbus, Ohio and the Inspector of Naval Material at Cleveland, Ohio. Such tooling will be delivered by the Government to the Contractor F.O.B. cars at or near Contractor’s plant for use by the Contractor in connection with the work to be performed under the contract. Such tooling has been subjected to prior use, and the Government makes no warranties or guar-
*616 anties whatsoever, express or implied, as to the physical condition of such tooling or as to its suitability for the manufacture by the Contractor of the articles to be furnished by the Contractor under the contract. The provisions of Section 25, entitled “Government-Furnished Material”, shall apply to such tooling.
(b) The Contractor agrees to furnish whatever tooling may be required in addition to such Government-Furnished Material in order to furnish the articles called for by the contract.
(c) The unit prices for the articles to be furnished under the contract shall include all charges that the Contractor may incur from furnishing additional tooling under subparagraph (b) of this Section.
(d) Unless otherwise agreed, it is the intent of this Section with respect to any additional tooling the Contractor may furnish under subparagraph (b) of this Section that such tooling shall become and remain the property of the Contractor.
*****
TIME OF DELIVERY:
The articles to be furnished shall be delivered in accordance with the following schedule :
as requested
The Govern ment desires that delivery be made within the number o: f days after date of contract set forth in the schedule b elow:
Items: 0-120 121-150 151-180 181-210 211-240 Days Days Days Days Days
- 400' 400 400 400 400 C3 rH
_ 600 600 600 600 600 ,0 rH
241-270 271-300 301-350 351-380 Days Days Days Days 381-410 Days
la__ 400 400 400 400 400
lb_ 600 600 600 600 735
Bidder shall insert, in the appropriate space above, the schedule in accordance with which delivery will be made. Unless the bidder specifies otherwise in the space provided above, his bid shall be deemed to ofer delivery in accordance with the Uovemmenfs desired delivery stated above.
* * * ‡ *
SECTION* 3. CHANGES
(a)The contracting officer may at any time, by a written change order, and without notice to the sureties, *617 make changes in any one or more of the following: (i) Drawings, designs, or specifications; (ii) quantities or items of any spare-parts list; (iii) method of shipment or packing; (iv) place of inspection, delivery, or acceptance; (v) time or rate of delivery, to the extent specified in the Schedule; and (vi) increases or decreases in the amount of services or articles to be furnished hereunder, to the extent specified in the Schedule. If the schedule designates a bureau other than the Bureau of Supplies and Accounts as the “Bureau for Changes,” such change orders may also be issued by the chief of such other bureau, or by his representatives duly authorized in writing, which authorization may be specific or general in its scope.
(b) If any such change affects the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both.
(c) Any claim by the Contractor for adjustment under this section must be asserted within thirty days from the date the change is ordered, or within such further time as the contracting officer may allow. Failure to agree to the adjustment shall be a dispute concerning a question of fact within the meaning of the section of this contract entitled “Disputes.” Nothing provided in this section, however, shall excuse the Contractor from proceeding with the contract as changed.
s{s % i}{ *
SECTION 15. TERMINATION FOR DEFAULT
(a) Whenever the Contractor
(1) refuses or fails to make deliveries of the articles called for herein within the time specified in this contract, or
(2) otherwise defaults in the performance of this contract or so fails to make progress in the prosecution of the work hereunder as to endanger performance of this contract in accordance with its terms and fails to cure such default or failure within a period of 10 days (or such longer period as the contracting officer may allow) after receipt from the contracting officer of a notice specifying the default or failure,
the Government, subject to the provisions of paragraph (a) of the Section hereof entitled “Termination at the Option of the Government” and of paragraph (/) below, may by a notice in writing to the Contractor terminate *618 the performance of work under this contract in whole or in any part.
(5) In such event, the Government may require the Contractor to transfer title and deliver to the Government in the manner, to the extent and at the times directed by the contracting officer, (1) any completed articles and (2) such partially completed articles, and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights (hereinafter called “manufacturing material”) as the Contractor has produced or acquired for the performance of such portion of this contract as has been terminated. The Contractor shall take such action as the contracting officer may direct for the protection and preservation of property in the possession of the Contractor in which the Government has an interest. ■
(c) In addition to its other remedies, the Government may, after exercising its right to terminate pursuant to paragraph (a) above, purchase in the open market or otherwise obtain articles or services similar to those called for by this contract in an amount which, together with the completed articles delivered or services performed by the Contractor under (b) above, shall not exceed the total quantity terminated. If the cost to the Government of the articles or services so procured exceeds the price fixed for such articles or services under this contract, the Contractor, and its surety, if any, shall be liable for such excess.
(d) Upon termination pursuant to this Section the Government shall pay to the Contractor the following amounts:
(1) For services performed or completed articles delivered to and accepted by the Government and not theretofore paid for, the contract price;
(2) For manufacturing material delivered to the Government and for the protection and preservation of property, pursuant to (5) above, the amount agreed upon by the Contractor and the contracting officer. Failure to agree shall be a dispute concerning a question of fact within the meaning of the Section of this contract entitled “Disputes.”
(e) The obligation of the Government to make any payments under this Section (1) shall be subject to deductions in respect of (i) all unliquidated partial or progress payments, payments on account theretofore made to the Contractor and unliquidated advance payments, (ii) any claim which the Government may have *619 against the Contractor in connection with this contract, and (2) in the discretion of the contracting officer shall be subject to deduction in respect of the amount of any claim of any subcontractor or supplier whose subcontract or order is related to the performance of this contract.
(/) This contract shall not be terminated under the Erovisions of this Section and the Contractor shall not e charged with any liability to the Government if the default or failure of the Contractor is due to causes beyond the control and without the fault or negligence of the Contractor. Such causes shall include but not be restricted to (1) acts of God or of the public enemy, (2) acts of the Government of the United States or any State or political subdivision thereof, (3) fires, floods, explosions, earthquakes, or other catastrophes, (4) epidemics, (5) quarantine restrictions, (6) strikes, (7) freight embargoes, (8) unusually severe weather, (9) inability of the Contractor to obtain equipment or material due to the operation of governmental priorities, preferences or allocations of equipment or material, or (10) delays of a subcontractor or supplier in furnishing material or supplies owing to causes beyond the control and without the fault or negligence of the Contractor unless the Contractor could reasonably have procured the materials or supplies from other sources.
(g) In the event that a Notice of Termination under this Section has been delivered to the Contractor and it thereafter is determined that the default or failure is due to causes beyond the control and without the fault or negligence of the Contractor, performance of work under this contract shall be deemed to have been terminated, effective date of the Notice of Termination, pursuant to the Section entitled “Termination at the Option of the Government,” and the rights and obligations of the parties shall in such event be governed by said Section.
$ $ H* ‡
SECTION 20. DISPUTES
Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the contracting officer, who shall mail to the Contractor a written notification of his determination. Within thirty days from said mailing the Contractor may appeal to the Secretary of the Navy, whose decision shall be final *620 and conclusive upon the parties. Pending. decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract.
if. * * * *
SECTION 2 6. GOVERNMENT-FURNISHED MATERIAL
(a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the material or equipment which the Schedule or the specifications state the Government will furnish (hereinafter referred to as the “Government-Furnished Material”). Title to the Government-Furnished.Material shall remain in the Government. The delivery dates for the articles to be furnished under this contract are based upon the expectation that the Government-Furnished Material will be delivered to the Contractor at the times stated in the Schedule or if not so stated in sufficient time to enable the Contractor to meet such delivery dates. In the event that any Government-Furnished Material is not delivered to the Contractor at such times, the contracting officer shall, if requested by the Contractor, make a determination of the delay occasioned the Contractor thereby, and shall grant to the Contractor a corresponding extension of time for the completion of performance. The Government shall not be liable to the Contractor for damages or loss of profit by reason of any delay in delivery of or failure to deliver any or all of the Government-Furnished Material, except that in case of such delay or failure, upon the request of the Contractor, an equitable adjustment shall be made in accordance with the terms and procedure provided in the Section of this contract entitled “Changes”.
$ ‡ $ &
7. Exhibit A, which was attached to the contract and made a part thereof by the tooling clause referred to above, consisted of eight legal-size sheets, identifying by name and number tools and dies which were owned by the defendant, located at three different locations — Columbus, Ohio, Cleveland, Ohio, and Biverdale, Maryland. The tanks could not be produced without such tools and dies and this fact was known by the plaintiff and defendant.
Exhibit A was, in effect, three lists of three separate sets of tools and dies, each of which contained a separate heading which read, in order, as follows:
*621 EXHIBIT A
THE TOOLING LISTED BELOW IS LOCATED AT THE CURTISS WRIGHT CORPORATION IN COLUMBUS, OHIO AND ARRANGEMENTS FOR ITS INSPECTION, AND INFORMATION THEREON CAN BE MADE BY CONTACTING THE BUREAU OF AERONAUTICS REPRESENTATIVE AT COLUMBUS, OHIO
NAVY FURNISHED TOOLS
PART DASH TOOL TOOL
NO. N(L NCL NAME
(This list of tools consisted of two pages.)
EXHIBIT A
THE TOOLING LISTED BELOW IS LOCATED AT THE MULLINS CORPORATION IN SALEM, OHIO AND ARRANGEMENTS FOR ITS INSPECTION AND INFORMATION THEREON, CAN BE MADE BY CONTACTING THE INSPECTOR OF NAVAL MATERIAL, CLEVELAND, OHIO
NAF NO. EBCO NO. PART NAME TOOL ITEM
(This list of tools consisted of two pages.)
EXHIBIT A
THE TOOLING LISTED BELOW IS LOCATED AT THE ENGINEERING AND RESEARCH CORPORATION IN RIVERDALE, MD. AND ONLY INFORMATION THEREON CAN BE OBTAINED BY CONTACTING THE BUREAU OF AERONAUTICS REPRESENTATIVE AT BALTIMORE, MD. SUCH TOOLING IS NOT AVAILABLE FOR INSPECTION
NAE NO. ERCO NO. PART NAME TOOL ITEM
(Four pages of tools were then listed.)
8. About one month prior to the award of the contract in suit,, the plaintiff was also awarded a contract by the Navy Department for the production of 10,000 practice bombs for a total consideration of $122,400. No delivery was effected under this contract and it was thereafter terminated for default.
9. (a) Prior to awarding the contract, defendant required plaintiff to submit a financial statement and arrangements for financing the contract satisfactory to defendant. Accordingly, plaintiff submitted its financial statement and for *622 warded to defendant a letter from the Bristol Bank and Trust Company, Bristol, Connecticut, in which, the bank stated in part that “we will make every effort, when the contract is processed, to arrange either through this bank or in conjunction with other financing institutions to make such funds as are necessary available to them [Lynch Brothers].” The defendant also made a preaward survey of plaintiff’s plant.
(b) At the time the contract in suit was awarded, plaintiff’s cash position was weak. Without a very substantial loan, it would have been impossible to perform the contract in suit. The plaintiff, on April IT, 1950, applied to the Reconstruction Finance Corporation for a long-term loan of $250,000. In support of this application, it furnished its current financial statement as of March 31, 1950, showing current assets totaling $121,800 (round figure) and current liabilities of $252,000.
In explanation of its need for the loan sought, the plaintiff, in replying to the request for information as to its history and management, stated in part as follows:
4. History, Management, etc.
A partnership was formed of three brothers, Walter, Thomas, Jr. and Robert T. Lynch of Pine Meadow, Connecticut, during the year 1940, to be known as Lynch Brothers. Land and buildings were purchased at this time for $3,000.00. Subsequently, additional land and buildings were purchased and remodeled to fit needs.
The partnership was incorporated on December 21, 1945 and organized January 2, 1946, at which time the new corporation of Lynch Brothers, Incorporated acquired the assets and assumed the liabilities of the partnership.
The partnership and corporation have never been in receivership, bankruptcy, 77-B, in hands of creditors’ committee, nor have they effected a compromise with creditors during their existence.
Profits and earnings of the partnership, the corporation and its officers have been reasonable during their operating periods. However, during the year ended July 31, 1949, and the eight months ended March 31, 1950, the following series of events occurred, all of which were detrimental to profits of the company:
*623 1. An engineering mistake on drawings by Pica-tinny Arsenal required establishment of a more costly additional method of welding.. This method cost a minimum of $22,000.00 additional in labor, plus the scrapping of aluminum valued at approximately $10,000.00.
2. Tremendous difficulties were also encountered with Electronic Control Panels on the aluminum welding machines. This trouble forced a time delay of approximately seven weeks with most of the company employees on a standby basis for that time. This cost was approximately $35,000.00.
3. It was finally necessary to secure the chief development engineer of General Electric Company at Schenectady for three weeks to correct their own defective equipment.
4. This slow-down resulted in a total loss of approximately $70,000.00 which was not due to any negligence of the management, but due strictly to the failure of new and latest design welding equipment of two large manufacturers and an error by the Navy in its drawings.
The Navy personnel has several times commended the management for overcoming the many difficulties in the fulfilling of the above contract which totaled slightly less than $1,000,000.00.
Subsequently plaintiff withdrew this loan application.
10. On April 17, 1950, the purchasing officer of the Navy Department’s Aviation Supply Office at Philadelphia wrote to the plaintiff concerning availability of Government-furnished tooling. The letter reads as follows:
By terms of subject contract, certain Government-Furnished tooling is available for the performance of this contract. You are advised that the tooling at Curtiss-Wright Corp. in Columbus, Ohio and the Mullins Corp. in Salem, Ohio is available for shipment to Pine Meadow at the present time. Certain of the production tooling currently being utilized by Engineering and Research Corp. is also available. A shipping request is being initiated this date to bar[14] Baltimore to have the available tooling at erco packed and shipped to you via inm [15] Springfield, and as the remainder of the tooling becomes available, it too will be *624 promptly forwarded. It is expected that this tooling can be packed-np and crated in two to three days’ time after eeco has been formally notified by the bae. Complete shipment of all the tooling at eeco cannot be anticipated until the end of May inasmuch as much of the fabrication tooling will be used until that time.
It is requested that you advise this office whether you desire any or all of the Mullins and/or Curtiss-Wright tooling to be forwarded to your activity.
11. The foregoing letter was the first notice to plaintiff that the Government tooling required for performance of the contract was in actual use so that its availability to the plaintiff would be delayed.
12. The plaintiff, on May 1, 1950, replied to the above-quoted letter as follows:
Reference is made your letter 17 April 1950 regard to tooling on the above contract.
Will you please issue the necessary instruction to have all Government owned tools, dies, jigs and fixtures now located at Curtiss-Wright, Columbus, Ohio and Engineering Research, Riverdale, Maryland shipped to this Company as soon as possible.
We will advise you shortly on the dies at The Mullins Corporation. Several manufacturers are quoting on this item 'but no decision has been reached here at this time.
13. The Navy Department had previously contracted for identical tanks with the Engineering and Research Corporation as the contractor. That firm was then in the completion stages of a second contract for 10,000 tanks, having completed delivery of a similar quantity under an earlier contract. The Mullins Corporation had been a subcontractor under the above contracts.
14. The plaintiff had previously solicited and received an informal letter quotation, dated March 15, 1950, from the Mullins Manufacturing Corporation, Salem, Ohio, for the furnishing of the outer shells (both upper and lower parts). The plaintiff did not have the necessary heavy equipment in its plant to utilize the very heavy dies used in forming these shells, and it was necessary that it secure a subcontractor to do this work.
*625 15. On or about April 18 or 19, tbe plaintiff’s president, together with Mr. Klaunberg, an officer of the Charles T. Brandt, Inc., firm of Baltimore, Maryland, journeyed to Salem, Ohio, to inspect the tools and dies for forming the upper and lower shells, which were then located at the Mullins Corporation plant. On April 28,1950, the Brandt firm submitted both an oral and a written bid to the plaintiff for producing the upper and lower outer shells, based on the understanding that the shells would be produced using the Government-owned dies which the plaintiff would have delivered to Brandt’s plant at Baltimore. Since the price quoted by Brandt was about $4 less per unit (one upper and one lower shell), the quotation was about $40,000 less than the Mullins quotation on the 10,000 (round figure) requirement. For this reason, the plaintiff, on May 5, 1950, wrote to the contracting officer’s representative at Philadelphia, requesting that all of the Government-owned tools at the Mullins Corporation be shipped to the Charles T. Brandt firm at Baltimore, Maryland, “as soon as is conveniently possible.”
16. Charles T. Brandt, Inc., proceeded to order the aluminum required for the upper and lower shells, and had the same available to it until the events later mentioned required it to dispose of the aluminum.
17. The plaintiff, in early May 1950, placed orders for some of its requirements for aluminum to be fabricated by it into parts for the fuel tank under the contract in suit.
18. On April 21, 1950, Walter T. Lynch, president of plaintiff, visited the Curtiss Wright Corporation at Columbus, Ohio, for the purpose of inspecting tooling, material handling equipment, painting dollies and other equipment in order to negotiate the purchase thereof for use by plaintiff in the performance of the tank contract. Plaintiff purchased such tooling and equipment from Curtiss Wright and had the same delivered to it. The tooling and equipment described herein was in addition to that which was Government-owned, which was located at the Curtiss Wright Corporation plant, and which was later shipped to the plaintiff.
*626 19. On May 18, 1950, plaintiff forwarded the following letter to the contracting officer:
When we originally bid on the above numbered contract and specified delivery would be as shown in the schedule, it was with the understanding that delivery was to start within 120 days of the date of the contract.
This was predicated entirely upon the ability of the Government to furnish the tools listed in the schedule in a reasonable time. Up to the present time we have received no tools and are being delayed thereby.
We therefore request an extension of time based on 120 days delivery after receipt of the tools at this plant.
i20. On May 20, 1950, plaintiff forwarded the following letter to the contracting officer:
The above contract calls for delivery starting in 120 days.
We agreed to this delivery in our bid based on securing Navy owned tools within a reasonable time.
At the present writing we have received no tools, either from Engineering and Eesearch, Eiverdale, Md., nor from Curtiss Wright, Columbus, Ohio.
We fail to understand the delay, particularly on the part of Engineering and Eesearch for such tools, at least as cover parts No. Erco F-1005, F1053, F1051 and several small sub-assemblies.
Under the circumstances we request an extension of delivery time based on 120 days delivery after receipt of the tools, dies and fixtures at this plant.
21. On June 1, 1950, the contracting officer dispatched a naval speed letter to the plaintiff in the following terms:
Contract N383s-33503. Eeur letter signed Walter T. Lynch dated 20 May 1950. By letters dated 23 May 1950 this office requested the cognizant Naval Inspectors to obtain release of the Navy owned tools for Contractor’s use in accordance with the terms of the subject contract. Since it is believed the tools will be received very shortly, it is not deemed necessary to extend the delivery schedule of the contract.
22. Five shipments of the Government-furnished tools from Engineering and Eesearch Corporation were received by the plaintiff beginning on May 31st and ending July 5, 1950. One shipment of Government-furnished tools was *627 received from the Curtiss Wright Corporation on July 21, 1950. The shipment of the Government-furnished tools from the Mullins Corporation was received by Charles T. Brandt, Inc., between July 28 and 31,1950.
23. While the plaintiff was being delayed in getting started on the performance of the contract work by the failure of the defendant to deliver the necessary tooling, the Korean military action began on June 25,1950. This had a profound effect upon the further course of events regarding the contract in suit.
24. Plaintiff placed orders with various suppliers for the furnishing of raw material and component parts with deliveries scheduled within 30 to 60 days after manufacture of the subassemblies.
In order to add 'an additional 5,000 feet of plant area to facilitate the tank contract, plaintiff poured a foundation between two of its buildings. Plaintiff further set up its painting lines, set up a line for subassembly on the welding of the saddle, changed the degreasing and cleaning facilities and expanded them, put in stainless steel tanks for the cleaning of the upper and lower shells, changed the location and built a new facility to house the generating plant for the furnishing of current to the aluminum welding lines, set up a production control procedure, and, in short, completely established new physical locations and various stations as far as inspection was concerned.
Plaintiff adapted, to the extent possible, Government tooling to its equipment as and when portions thereof were received at its plant, and made test samples of some of the parts. Until some upper and lower shells had been stamped out by Brandt and delivered to plaintiff’s plant, it was not practicable to make subassemblies or parts to be fitted into the tanks. Delivery of some upper and lower shells from its subcontractor would be needed so that the accumulated tolerances of the shells and other parts could be ascertained.
25. In his July 19, 1950, message to Congress regarding the Korean action, the President of the United States stated in part:
Under the program for increasing military strength which I have outlined above, military and related pro *628 curement will need to be expanded at a more rapid rate than total production can be expanded. Some materials were in short supply even before the Korean situation developed. The steel industry, for example, was operating at capacity levels, and even so was not able to satisfy all market demands. Some other construction materials, and certain other products, were also under pressure and their prices were rising, even before the outbreak in Korea.
The substantial speed-up of military procurement will intensify these shortages. Action must be taken to insure that these shortages do not interfere with or delay the materials and the supplies needed for the national defense.
Further, the dollars spent now for military purposes will have a magnified effect upon the economy as a whole, since they will be added to the high level of current civilian demand. These increased pressures, if neglected, could drive us into a general inflationary situation. The best evidence of this is the recent price advances in many raw materials and in the cost of living, even upon the mere expectancy of increased military outlays.
26. Because of the delays by defendant in delivery of the tooling, causing plaintiff’s plant to become and to remain virtually idle which in turn caused unproductive overhead aggravating plaintiff’s already precarious financial position, because of the uncertainty resulting from the Korean action, and because of the refusal of defendant initially even to consider any extension of time of delivery, The Bristol Bank and Trust Company, plaintiff’s source of financing, declined to finance.
27. As a result of the foregoing, on July 3, 1950, plaintiff was forced to apply to the United States District Court for the District of Connecticut for an Arrangement under Chapter XI of the Bankruptcy Act. Murray McConnel, president of The Cuno Engineering Corporation, Meriden, Connecticut, the largest creditor of Lynch, was, on petition of Cuno, appointed as Receiver of plaintiff on the same day.
28. On July 5, 1950, plaintiff’s representatives visited Commander Stafford, a contracting officer, and requested an increase in price and an extension of the delivery date. Commander Stafford stated he would consider an extension of *629 time but that lie would not consider an increase in price, since the contract in suit was a fixed-price contract. An extension on the delivery date was offered to plaintiff on August 3, 1950. However, plaintiff refused to accept it for the reasons set forth in finding 32.
29. On September 28, 1950, plaintiff’s plan for Arrangement was filed and was confirmed by order of the Court on October 31,1950.
,30. The delays occasioned by defendant’s failure to deliver the tooling caused substantial increased costs to plaintiff, both in extended overhead and in costs of performance, which entitled plaintiff to the equitable adjustment provided by paragraph 25(a) of the contract (Government-Furnished Material).
31. On October 11, 1950, the contracting officer sent the following letter to the plaintiff:
The Inspector of Naval Material, Springfield, Mass., has advised the Contracting Officer that the deadline date for the commencement of production of the auxiliary fuel tanks under the subject contract is 1 October 1950, if the contractor is to meet the schedule delivery of 1,000 tanks by the contract delivery date. The Inspector also advises that the deadline date for the commencement of production of the shells by the sub-contractor is 14 September 1950, if the contractor is to produce 1,000 tanks by the contract delivery date.
It has come to the attention of the Contracting Officer that the contractor has not commenced the physical assembly and manufacture of the tanks covered by the subject contract, and that the contractor has not completed arrangements with suppliers or sub-contractors for the furnishing of major items of material and components which will be required in the manufacture of such tanks.
The above facts, in the opinion of the Contracting-Officer, establish that the contractor has so failed to make progress in the prosecution of the work under the subject contract as to endanger performance of the contract in accordance with its terms. Accordingly, the contractor is hereby notified that in the event such failure to make progress with the work is not cured within 10 days after receipt of this letter, the Contracting Officer may terminate the performance of work under subject contract in accordance with Section 15 of the contract.
*630 It is requested that the Contracting Officer be notified in writing within 10 days after receipt of this letter as to the action taken by the contractor to cure the failure to make progress under the contract.
32. On October 18,1950, the plaintiff replied to the above-quoted letter, as follows:
This will acknowledge receipt of your letter of October 11, 1950 advising that we have passed the deadline of October 1, 1950 for commencement of production of Auxiliary Fuel Tanks and that the sub-contractor deadline for commencement of production of shells was September 14,1950. In the subject letter you call attention to Section 15 of the contract and put us on notice that in the event our failure to make progress is not cured within 10 days after receipt of your letter, the Contracting Officer may terminate subject contract in accordance with Section 15.
We have never refused to perform our contract. It is our earnest desire to fulfill all of our contract obligations. We must admit that we have failed to show sufficient progress to indicate that we will be able to maintain the delivery schedule. This failure on our part is due to causes beyond our control. We refer here to the failure of the Government to make delivery of necessary tools for a period of very nearly four months after the contract was entered into on April 13, 1950. In the interim our plant was practically idle. Unproductive overhead continued and profitable operations were impossible. This situation was a large factor in the decision of our bank not to finance the contract and caused considerable anxiety among our creditors.
The decision of the bank not to finance in turn forced us to ask for an arrangement under Section 11 under the Bankruptcy Act. During the interim of the delay on the part of the Navy in delivery, of tools, the Korean situation arose with resultant uncertainty not only on our part but on the part of materialmen and sub-contractors with respect to increased costs, increased deposits on order, etc. We could not during such interim ask for delivery of the huge quantities of materials required when there was no certainty as to when tools would be delivered and permit production and income therefrom. We admit that we and our sub-contractors had neither the storage facilities or the resources to pay for stockpiling, nor should the Navy Dept, have expected us to do so.
*631 Section 15, Par. (f2 and flO) of the contract are unquestionably applicable to this case. It is therein provided that this contract shall not be terminated for default if the default or failure of the contractor is due to causes beyond the control of the contractor including (2) acts of the Government of The United States and (10) delays of a sub-contractor or supplier in furnishing materials or supplies. It is our belief that the delay of the Government in delivery of tools adversely affected not only the contractor but also the sub-contractors and suppliers.
On August 3, 1950 the A.S.O. advised us that due to the delay of the Government in forwarding tools, the contract was amended to provide that “delivery be made within the number of days after August 1,1950 set forth in the schedule below”. It was further stipulated therein that no change in price and no payment of additional charge would result. It was further stipulated that the amendment would become effective upon our signing and returning two copies. We did not return the amendment for the following reasons.
1. We were entitled to an adequate extension of time under the terms of the contract and as a matter of law.
2. When we originally asked in May for an extension of time of 120 days from date of delivery of tools we felt that such an extension would be adequate and would satisfy our sub-contractors and materialmen and relieve the anxiety of existing creditors and of our banking facility. We were advised in response to our request that since tools were about to be delivered it was not deemed necessary to extend the delivery time. The tools were not all delivered until July 28th.
3. The amendment or extension of time dated August 3 was wholly inadequate. It does not follow that the delay of the Government until July 28th in delivery of the tools caused a delay to the contractor and his sub-contractors of only a commensurate length of time. The situation of the contractor due to such delay had radically changed in the respects already related.
The following factors, which are to some extent a repetition of what has already been said, should be considered with respect to the requests which we make at the conclusion of this letter.
*632 The Invitation For Bid on the above contract was received March 9, 1950 with opening date March 20, 1950. A request for ten days additional time was requested by the contractor for the reason that Print No. F-1100 on the Saddle and Beam Assembly was missing on the Invitation to Bid. This request was refused.
Immediately upon receipt of this contract, namely April 17,1950 at the contractor’s plant in Pine Meadow, Connecticut, on that very day in fact this contractor, together with a vice president of Charles T. Brandt Company, sub-contractor, proceeded to Columbus, Ohio to inspect tools available and make provisions for fabricating necessary tools not supplied under Section lb.
Under advice dated April 17,1950 from the Aviation Supply this contractor was further advised that additional tools located at Engineering & Research Company would be packed and shipped after two or three days upon receipt of notification and as the remainder of the tooling became available, it would be promptly forwarded. This contractor was further advised in this letter that complete shipment of all tooling at erco could not be anticipated until the end of May. When the Invitation to Bid was entered it was believed by the contractor that all tools would be made available at once. It was not until after the contract was received that the contractor was advised by Aviation Supply Office letter of April 17, 1950 that there would be a delay.
Records of this contractor will indicate that Purchase Orders for tools not to be furnished in accordance with Section lb and for materials required under the subject contract were promptly entered.
In the meantime the necessary manufacturing facilities of the contractor were held in idleness pending receipt of the tools. Holding the plant on a standby basis during the months of May and June awaiting tools caused anxiety on the part of both the bank and creditors. With the happenings in Korea in later June, and at which time tools had still not been made available, this contractor was forced to appeal to the Federal Court in Hartford to make arrangements with his creditors. A receiver was appointed by the court on July 3, 1950. When this became known, outstanding purchase orders were not filled.
Government furnished tools were received on the following dates:

*633
Govt. B/L No. Shipping Date Receiving Date

No N16036500 — Erco_ 6/ 5/50 6/ 8/50
No N16036518 — Erco_ 6/13/50 6/15/50
No N16036510 — Erco_ 6/ 6/50 6/12/50
No N16036477 — Erco_ 5/23/50 5/31/50
No NS2577113 — Curtiss Wright- 7/13/50 7/21/50
Parcel Post — -Erco_ 6/28/50 7/ 5/50
The most damaging delay was in forwarding dies from the Mullins Company, Salem for stamping the shells of the gasoline tanks. These were not received until July 28, 1950 at a sub-contractor’s plant. This in spite of the fact that these tools were inspected by this contractor at the Mullins Company, Salem, Ohio on April 18,1950 by arrangement of bak, Columbus.
For the reasons stated we ask for a complete review of this contract and that you earnestly consider the following requests of the contractor.
1. We ask for a withdrawal of your notice of October 11th indicating your intention to terminate the contract within ten days. This company will be discharged from receivership on or about October 23rd.
2. We request reconsideration of the extension of time dated August 3rd and that an extension based on a realistic consideration of the actual delay caused the contractor be granted. We make this request for the purpose of giving you time to consider request No. 3 which follows.
3. Under all of the unusual conditions existing in this case as related herein we feel that in all justice to us the Government should cancel this contract without cost to the contractor or liability of the Government to the contractor as permitted by Section 16 Termination At the Option Of The Government.
Specific attention is called to the fact that Section 15, F2 and F10 prevent cancellation under that section where the default is due to causes beyond the control of the contractor.
For the reasons stated, among others, as to which we reserve all rights and defenses, this contractor is led to believe on advice of counsel that were he to refuse to complete the subject contract, this contractor would have meritorious defense to any claim that the Government might make by reason of such refusal. This contractor, therefore believes that his request for cancellation of the contract without prejudice or liability on his part or that of the Government would be a just and equitable disposition of the case.
This contractor asks your earnest consideration of all that has been said and to express his willingness *634 to produce any other data or information that might be required. He further asks that nothing said above be construed as a refusal to perform under the subject contract.
33. On October 24,1960, the contracting officer forwarded a registered letter to the plaintiff, terminating performance under the contract in suit for default of the plaintiff, in the following terms:
Ref: (a) ASO Itr PGO-A :OWS :ht, N383s-33503 (11785) dated 11 Oct. 1960.
Reference (a) informed the Contractor that he had so failed to make progress with the prosecution of the work as to endanger performance of the contract in accordance with its terms. Reference (a) further notified the Contractor that in the event such failure to make progress with the work was not cured within ten days after the receipt of reference (a), the Contracting Officer may, under authority of Section 15 of the contract entitled “Termination For Default”, terminate performance of work under this contract.
Ten days have elapsed since receipt of reference (a) by the Contractor, and the Contractor has not cured the failure to make progress with the work as specified in reference (a). Therefore, in accordance with said Section 15 of the contract, the Contractor is hereby notified to. terminate all work on the subject contract. Such termination shall be effective upon receipt of this letter.
34. The plaintiff did no more work on the contract in suit after receipt of the termination notice. In the performance of work up to this time, the plaintiff had expended the sum of $76,496.11. This amount has been verified by the defendant pursuant to pretrial procedures tinder Rule 28(b)(2) and 28(b) (3).
35. With respect to the appeal referred to in paragraph 12, page 6, of the petition, the parties have stipulated as f oEows:
Before the
ARMED SERVICES BOARD OF CONTRACT APPEALS
Navy Panel Washington 25, D.C.
Appeal of 1
The Lynch Brothers, Incorporated [ ASBCA No. 877
Under Contract N383s-33503 J
*635 STIPULATION
Come now the parties by their respective attorneys and agree as follows:
1. That there is pending in the United States Court of Claims a suit entitled Litchfield Manufacturing Corporation (formerly The Lynch Brothers, Incorporated) v. United States, number 453-56, which suit involves each and every issue presented by the parties in the above styled appeal.
2. That the United States has filed a counterclaim in said suit. .
3. That the Government has filed in the above styled appeal a Motion to Dismiss as well as an amended Motion to Dismiss, the tenor of each 'being that the disputes between the parties is a proper one for adjudication by the Court of Claims.
4. That, in the interest of obtaining expeditious final adjudication of the issues between them and to avoid multiplicity of hearings and unnecessary expense to both parties, the parties have agreed to waive their respective rights to proceed under the article of Contract N383s-33503 entitled “Disputes”.
5. That the Department of Justice has agreed that the case is properly before the Court of Claims and a withdrawal by the parties of the within appeal will not prejudice the rights of either party to prosecute their respective claims and counterclaims in said Court to a final conclusion and judgment. A copy of a letter from the Department of Justice, dated August 19, 1959, is attached hereto and made a part hereof.
WHEREFORE, it is stipulated by the parties that each agree and do hereby withdraw Appeal No. 877, The Lynch Brothers, Incorporated, under Contract N383s-33503 and do fully and finally waive their respective rights under the article of Contract N383s-33503 entitled "Disputes".
Dated this 18th day of September 1959.
APPROVED
(S) E. E. Bylston
Successor Contracting Officer
(S) Kahl K. Spriggs
KAHL K. SPBIGGS
Attorney for The Lynch Brothers, Incorporated
(S) William Sellman
WILLIAM: SELLMAN
Counsel for the
Bureau of Supplies and Accounts
*636 36.The letter referred to in paragraph 5 of the above-mentioned stipulation is as follows:
August 19, 1959
Kahl K. Spriggs, Esquire
504 Southern Building
Washington 5, D.C.
Be: Litchfield Manufacturing Corporation v. United States, Court of Claims No. 453-56
Dear Mr. Spriggs:
Mr. B. B. Oliver III of the General Counsel’s office of the Department of the Navy has discussed with us the problems relating to the administrative appeal of the above plaintiff corporation. Under date of August 13, 1959 Mr. Oliver advised us of your desire to dismiss the contractor’s appeal provided you would not prejudice your client’s interest in the pending action in the 'Court of Claims.
Issue has been joined in the above captioned case and the Government has not pleaded as a defense the failure to exhaust administrative remedies. Under the special circumstances of this case, you are advised that in the event plaintiff dismisses its administrative appeal or if the appeal is dismissed for lack of prosecution, the Government will not raise as an affirmative defense plaintiff’s failure to pursue or exhaust its administrative remedies before the Armed Services Board of Contract Appeals.
Yours very truly,
GEO. s. LEONARD
Acting Assistant Attorney General
Civil Division
By: (S) John B. Miller
JOHN B. MILLER
Chief, Court of Claims Section
cc: Office of General Counsel Department of the Navy Washington 25, D.C.
37. In view of the nature of the above-quoted documents (findings 35 and 36), no finding is made as to findings of fact by the contracting officer.
38. On the entire record, it is reasonably inferable that if the necessary Government-furnished tools had been furnished to the plaintiff by the defendant promptly, the plaintiff would have been able to obtain the necessary financing to enable it to perform the contract. Plaintiff’s difficulties, *637 which caused the defendant to issue the notice for termination for default, stemmed from these two factors.

On the Defendant's Counterclaim,

39. After the action by the defendant in terminating the plaintiff’s performance under the contract in suit, the defendant solicited bids from about 70 potential suppliers for opening (as amended) on December 20, 1950. The specifications submitted along with this invitation were identical with the specifications for the contract in suit except that a certain drawing relating to crating had been eliminated. Crating was still required, however.
Of the 13 bidders who responded, Drayer-Hanson Incorporated was the low bidder with a bid of $124.50 per tank, or a total of $1,261,807.50 for the 10,135 tanks required. Thereafter, this firm represented to the Navy officials that it had made a mistake in its bid.
.40. The defendant thereafter voluntarily canceled the above-mentioned invitation for bids.
41. The defendant thereafter negotiated with Drayer-Hanson Incorporated and entered into a negotiated contract with it dated February 2, 1951, pursuant to the provisions of Section 2(c) (1) of the Armed Services Procurement Act of 1947, as amended, for the production of 10,135 external auxiliary fuel MK-12 tanks at the price of $147.50 per unit.
42. The following provision was contained in the Drayer-Hanson Incorporated contract:
SAMPLE TANKS:
An assembled tank and a partially disassembled tank will be shipped in an “as is” condition with the Government owned tooling to the Contractor for use in connection with the work to ibe performed under the contract. Neither tank, however, shall be construed as a manufacturing standard or sample, and the tanks to be furnished by the Contractor under this contract must conform in all respects to the specifications and drawings referred to in this contract.
The contract in suit contained no provision for the furnishing by the defendant of any sample tank. Lynch, how *638 ever, requested that it be furnished with a sample tank and the defendant informed it that the units had to be produced from the drawings and specifications.
43. The Drayer-Hanson Incorporated contract contained a partial payment provision, in pertinent part, as follows:
207-1.1 PARTIAL PAYMENTS
(a) Payment of the contract price shall be made as follows:
(1) Seventy-five percent (75%) of the contract price shall be paid as partial payments in accordance with the provisions of this paragraph (1). The Contractor, from time to time as the work progresses, but not more frequently than once a week, may submit invoices to the Naval Inspector for certification by him as to the percentage of completion of performance of the entire contract. The amount of each such invoice shall be that percentage of the total contract price equal to the percentage of completion of the contract, as so certified by the Naval Inspector, such sum to be less any amounts previously .billed for partial payments. Partial payments shall be made to the Contractor of seventy-five percent (75%) of the net amount of each invoice so submitted and certified. If upon delivery and acceptance of all articles called for by this contract, seventy-five percent (75%) of the total contract price has not been paid under this paragraph (1), any balance of such seventy-five percent (75%) shall be paid upon submission of a properly certified invoice.
(2) Twenty-five percent (25%) of the contract price of each article shall be paid upon delivery and acceptance thereof upon the submission of properly certified invoices showing the article or articles delivered, the contract price of each, and the statement “twenty-five percent (25%) due upon delivery.”
(44. Pursuant to the partial payment provisions of the contract, and after an initial shipment of one tank on May 25, 1951, Drayer-Hanson Incorporated submitted invoices beginning July 31, 1951, and every few days thereafter, which were approved by the Navy for partial payments.
45. The defendant paid to Drayer-Hanson Incorporated the sum of $1,493,024.68 for 10,135 tanks under the re-let contract.
*639 CONCLUSION OF LAW
Upon tbe foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States seventy-six thousand, four hundred ninety-six dollars and eleven cents ($76,496.11). Defendant’s counterclaim is dismissed.

 Lynch Brothers, Incorporated, a Connecticut Corporation, by amendment to its charter changed its name to Litchfield Manufacturing Corporation. The duration of such corporation was by amendment to its charter terminated on July 29, 1955, and the assets of the corporation were on that day transferred to Holly Corporation, a Delaware corporation, the sole stockholder, in complete liquidation of Litchfield, which brings the action here.

 The contracting officer acted pursuant to section 15 of the contract which provides, in pertinent part, as follows :
“Section 15. Termination nor default
“(a) Whenever the Contractor '
“ ‘(2) otherwise defaults in the performance of this contract or so fails to make progress in the prosecution of the work hereunder as to endanger performance of this contract in accordance with its terms and fails to cure such default or failure within a period of 10 days (or such longer period as the contracting officer may allow) after receipt from the contracting officer of a notice specifying the default or failure,’
the Government. * * * may by a notice in writing to the Contractor terminate the performance of work under this contract in whole or in any part.”
Notice of the intent to terminate for default was sent plaintiff on October 11, 1950.

 On August 3, 1950, the contracting officer offered plaintiff an extension of time on the desired delivery dates. However, plaintiff did not accept such an extension because it felt that the amount of time granted would not be adequate.

 “Section 25. Government-furnished material
“(a)The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the material or equipment which the Schedule or the specifications state the Government will furnish (hereinafter referred to as the ‘Government-Furnished Material’). Title to the Government-Furnished Material shall remain in the Government. The delivery dates for the articles to be furnished under this contract are based upon the expectation that the Government-Furnished Material will be delivered to the Contractor at the times stated in the Schedule or if not so stated in sufficient time to enable the contractor to meet such delivery dates. In the event that any Government-Furnished Material is not delivered to the Contractor at such times, the contracting officer shall, if requested by the Contractor, make a determination of the delay occasioned the Contractor thereby, and shall grant to the Contractor a corresponding extension of time for the completion of performance. The Government shall not be liable to the Contractor for damages or loss of profit by reason of any delay in delivery of or failure to deliver any or all of the Government-Furnished Material, except that in case of such delay or failure, upon the request of the Contractor, an equitable adjustment shall be made in accordance with the terms and procedure provided in the Section of this contract entitled ‘Changes’.”

 Supra, footnote 4.

 The Commissioner has found that in the performance of work up to the time of the termination for default, plaintiff had spent the sum of $76,496.11. This amount has been verified by defendant pursuant to pretrial procedures under Rules 28(b) (2) and 28(b) (8) and is not in dispute in this case.

 Plaintiff appealed to the Armed Services Board of Contract Appeals, the contracting officer’s termintion for default under the “Disputes” article of the contract. The parties, by stipulation, have agreed to waive their rights to go before the Board and seek direct adjudication of their claims by us.

 Paragraph (g) of section 15 entitled “Termination for Default” provides as follows:
“(g) In the event that a Notice of Termination under this Section has been delivered to the Contractor and it thereafter is determined that the default or failure is due to causes beyond the control and without the fault or negligence of the Contractor, performance of work under this contract shall be deemed to have been terminated, effective date of the Notice of Termination, pursuant to the Section entitled ‘Termination at the Option of the Government,’ and the rights and obligations of the parties shall in such event be governed by said Section.”

 We are not concerned here with the situation which confronted us in Klein v. United States, 152 Ct. Cl. 8, 285 F. 2d 778 (1961), and Goldwasser v. United States, 163 Ct. Cl. 450, 325 F. 2d 722 (1963). In those cases we allowed breach of contract damages where the contracting officer wrongfully terminated for default government contracts which were not in default. Here plaintiff is seeking termination costs (no portion of the sum claimed includes a profit factor) on the grounds that although it was in default, its default was caused by defendant’s actions.

 In reply to defendant’s notice of intention to terminate for default plaintiff stated that “[w].e must admit that we have failed to show sufficient progress to indicate that we will be able to maintain the delivery schedule.”

 The decision of the bank not to finance the project forced plaintiff to ask for an arrangement under Chapter 11 of the Bankruptcy Act. Under such a situation plaintiff’s materialmen and subcontractors refused to deliver the material and subassemblies to plaintiff.

 In the past we allowed recovery in the Kiewit line of cases based on an implied obligation on the part of the government not to willfully or negligently interfere with the contractor in the performance of his contract. In allowing breach of contract damages, we required plaintiff to show negligent or willful conduct on the part of defendant in failing to promptly make available government-furnished materials. In those cases, the “government-furnished material” clause did not contain a provision for an equitable adjustment in the event of a government delay. Since in this case we find that there was a breach on the part of the government under the test postulated in Kiewit, we do not go into the effect of the “equitable adjustment” provision in a situation where the contractor fails to prove negligent conduct on the part of the defendant.

 Our Trial Commissioner has found that, nevertheless, the hank was willing to make the necessary funds available to plaintiff. This factual determination by our Trial Commissioner who had the opportunity to judge the credibility ■of the witness shall be presumed to be correct (Rule 48, now Rule 66) unless defendant makes a strong affirmative showing to the contrary. Here plaintiff has introduced specific testimony of a witness which supports the recommended finding. Defendant has countered with a theoretical argument in support of its position that the bank would not have made the necessary funds available because of plaintiff’s poor financial position, under these circumstances, we must accept the trier’s evaluation. Davis v. United States, 164 Ct. Cl. 612, 616-17 (1964); Commerce International Co., Inc. v. United States, this day decided, ante, p. 529.

 Bureau oí Aeronautics Representative.

 Inspector of Naval Material.