MaddeN, Judge,
delivered the opinion of the court:
This is a suit for damages for the alleged wrongful termination by the Government of a contract between the Government and the plaintiff’s assignor, Beam Radionics Corporation, hereinafter called Beam. The plaintiff is the assignee for the benefit of creditors of Beam. The Government’s original answer denied liability, alleged that the plaintiff had failed to exhaust his administrative remedies, and counterclaimed for alleged overpayments to Beam. By amendment to its answer, filed by leave of court, the Government pleaded fraud on the part of Beam, and added two counterclaims for statutory penalties for fraud, one counterclaim relating to the contract in suit and the other relating to another contract which Beam had with the Government.
On June 27, 1951, Beam entered into a negotiated contract with the Army Corps of Engineers for the furnishing of 1,000 electric lighting sets at prescribed prices per set *11 and wit'll prescribed dates for beginning and completing deliveries. The total contract price was $1,675,000. This contract was known as contract 955. Before entering into contract 955 the Government had made an investigation of Beam’s ability to perform. Beam had before that time undertaken and completed a dozen or more other military supply contracts.
Beam made subcontracts for the acquisition of the parts for the electric lighting sets. It planned to itself assemble, test, package and ship the completed sets. The rubber-insulated cable which was to be a part of each set had to meet rigid contract specifications for use at very low temperatures. The Government was to test the cable at its engineering and development laboratory at Fort Belvoir, Virginia. At the time contract 955 was made, no cable meeting the contract requirements had been produced, and the Government was aware of that fact. The United States Rubber Company had been conducting research in the development of rubber-insulated cables, including cables of the type needed for contract 955. The Government’s officials had informed Beam that United States Rubber’s cable came closest to meeting the contract specifications.
Before contract 955 was made, Beam had made another contract, No. 7939, with the Army Corps of Engineers for the furnishing of floodlighting sets which required a somewhat similar cable. For both contracts, Beam had subcontracted the production of the cable assemblies to Brad Harrison Co., and that company had subcontracted the production of the cable itself to United States Rubber. United States Rubber submitted samples of cables to the Corps of Engineers’ testing laboratory at Fort Belvoir in August and October 1951. These samples were rejected by the laboratory. Although delivery of the lighting sets was to have commenced on November 20, 1951, and although by that date not even a sample of cable meeting the contract specifications had been produced, the Government on December 4, 1951, and thereafter until the latter part of February 1952 continued to issue change orders, to make plans for inspection of finished parts, and in other ways to show that it still expected and desired performance of the contract.
*12 A new cable sample was prepared for testing in early February 1952. Just before it was submitted, Beam officials bad a conference with Mr. Krauss, a representative of the Government’s contracting officer. The purpose of the conference was the discussion of Beam’s other contract, No. 7939, but Krauss also said he was considering terminating contract 955, or deleting the cable from the contract. Beam’s representative said Beam would be happy to be relieved of the troublesome cable problem.
A cable sample had been submitted on February 9. It passed the test for contract 7939 but not the more rigorous test for contract 955. On February 26, a new sample was submitted. Krauss was aware of this submission. The tests were made, but Krauss made no effort to learn how the tests were progressing. The official laboratory report was not issued until the middle of May.
On April 1, 1952, the contracting officer notified Beam of the termination of contract 955
pursuant to General Provision 11, Default. The reason for this action is your failure to make delivery of the sets as you were obligated to do under the terms of your contract.
The letter also said that it constituted findings of fact from which the contractor could appeal. Beam appealed on April 10, saying it was ready to proceed with the manufacture as soon as the cable submitted for testing had been approved.
On May 21 the contracting officer sent Beam another “Findings of Fact” which said, among other things:
Contractor has failed to supply satisfactory cable within time when delivery schedule could possibly be met. No definite subcontracts were entered into for cable.
These findings further said that Beam’s available space was inadequate for the timely assembling of the lighting sets, and that Beam’s financing was not sufficient for the performance of the contract.
On June 4, 1952, Beam appealed the contracting officer’s decision. The Armed Services Board of Contract Appeals held a hearing in May 1953 and on October 1 decided that the Government had no right to terminate contract 955 for default. The Board held that the Government had, by its *13 conduct, waived compliance with, tbe delivery dates prescribed in tbe contract; tbat tbe Government did not prove tbat Beam did not bave sufficient space for tbe timely assembly of tbe lighting sets; and tbat Beam’s financial position was not different at the time of cancellation than it bad been when it was investigated before the award of the contract. The Board found that the cable sample submitted on February 26 complied with tbe specifications of tbe contract.
In tbe course of its discussion the Board said:
Under tbe circumstances of this case, we are of tbe opinion tbat tbe proper remedy was tbat of termination for the convenience of tbe Government, if termination was desired.
On November 27, 1953, tbe contracting officer wrote Beam, referring to the decision of tbe Armed Services Board of Contract Appeals, and saying:
In view of said decision tbe Government deems tbe above notice of default to have been issued pursuant to Clause 21 of the contract entitled, “Termination for tbe Convenience of the Government”, for the complete termination thereof, which became effective as of 3 April 1952, tbe date of the receipt of such notice by the contractor.
The contracting officer thereby sought, a year and a half after tbe event, to convert the April 1,1952, termination for default into an April 1, 1952, termination “in the best interests of tbe Government,” commonly called “termination for tbe convenience of the Government.” If tbat was effectively done, it would mean tbat tbe Government’s action was not wrongful, because tbe contract expressly granted tbe Government tbe right to so terminate under certain conditions. And it would mean tbat tbe Government’s contractual liability to Beam would be limited to tbe items of compensation named in tbat provision of the contract (see finding 2, contract article 21 (e) and (f)), and the liability would, in this and in most cases, be small.
Tbe plaintiff, in response to tbe contracting officer, asserted, and in this suit asserts, that tbe Government did not terminate tbe contract for convenience, but breached it and is liable for tbe damages resulting from the breach.
*14 On April 19, 1955, the Government advised Beam that it would proceed to make a unilateral determination of its liability to Beam under the contract provisions relating to termination for convenience. It did not make such a unilateral determination. On September 13, 1955, Beam assigned its assets to the plaintiff for the benefit of its creditors. On January 17,1956, the plaintiff filed the instant suit.
The Government asserts, in bar of the entire claim, that Beam forfeited its rights under its contract, by corruptly practicing or attempting to practice a fraud against the United States in connection with the contract in suit. The statute relied on is 28 U.S.C. § 2514, which provides:
A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture.
The asserted fraudulent conduct was Beam’s presentation of requests for and receipt of certain partial payments during the course of the contract. The Government also bases its second counterclaim, for penalties under 41 U.S.C. § 119, upon these allegedly fraudulent transactions.
Beam had made a subcontract with The Branchell Co. for the production of parts for the lighting sets. Branchell was to acquire and use, and Beam was to pay for and own, the mold, tools and fixtures needed to produce these parts. Branchell sent Beam a bill for the tools and Beam requested and received a partial payment of 75 percent on the amount of Branchell’s bill. At the time it received the partial payment Beam had not paid the Branchell bill. Beam also made a subcontract with Shepard Engineering Co. providing that Shepard would produce parts for the lighting sets, and would manufacture tools to make the parts. This subcontract provided that the tools were not to become the property of Beam until completion of the contract. Shepard billed Beam for the tools, though in fact, unknown to Beam, it already had the necessary tools left over from a former con *15 tract. Beam requested and received a 75-percent partial payment from the Government on the bill which Shepard had submitted, although it had not yet paid that bill. In addition, Beam requested and received partial payment based upon invoices from the Lewis Paper Products and Lorenz Engineering which had not yet been paid by Beam.
In the above instances, Beam had “incurred”, or supposed that it had incurred, the liability to its subcontractors shown by the invoices. It did not have, and was not supposed to have, possession of the tools covered by the invoices. Nor did the contract require that the invoice be paid before the contractor could receive partial payment thereon. The contract, in the article governing partial payments, provided only that:
(a) The Contracting Officer may, from time to time authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: * * *.
(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and nondurable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereta under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production: * * *.
The defendant argues that Beam was required to have acquired, that is, to have in its possession, any items for which it requested partial payment. It says that the requirement of paragraph (b), quoted above, that title to property acquired by Beam must vest in the Government, was violated when Beam secured partial payment for property which Beam had not yet acquired, since title to such property could not vest in the Government. But paragraph (b) expressly recognizes that partial payment might be made to Beam before it acquired property. It says that title to property acquired by Beam after partial payment was to vest in the Government upon such acquisition. The fact that Beam requested partial payment before it had *16 paid its subcontractors, or that, having received the partial payments from the Government, it did not promptly pay its subcontractors, did not violate the contract, and was not a fraud upon the Government. There was no fraud and therefore no basis for forfeiture of the plaintiff’s rights under the contract .in suit under the provisions of 28 U.S.C. § 2514.
The Government urges that Beam failed to exhaust its administrative remedies. It says that Beam failed to appeal the contracting officer’s settlement offer, which it says was a determination of the amount which Beam should receive on account of the termination of the contraot. This contention has no merit. The Government, on April 19,1955, advised Beam that it would proceed to make a unilateral determination, and would proceed to gather the records and make the audits necessary for that purpose. It never made the unilateral determination. There was no determination which the plaintiff could have appealed to the head of the department, even if we assume that there was a termination “for the convenience of the Government.”
We must now determine whether there was a termination for the convenience of the Government, as the Government asserts, or a breach of contract, as the plaintiff asserts. The difference is vital, particularly with regard to the measure of damages.
Article 21 of the contract, quoted in finding 2, says, in paragraph (a) :
The performance of work under this contract may be terminated by the Government * * * whenever the Contracting Officer shall determine that such termination is in the best interests of the Government.
The contracting officer, in fact, terminated the contract, on April 1, 1952, expressly for inexcusable default in performance by Beam. Not until November 27, 1953, did he put his mind on the question of whether it was “in the best interests of the Government” to have done so. By that time the Board of Contract Appeals had decided that Beam had been diligent in the performance of the contraot; that delay in performance had been unavoidable and had been waived by the contracting officer; that Beam did not lack space for *17 performing the contract; and that Beam’s financial capacity was substantially as good when the contract was terminated as it had been when that capacity was investigated before Beam was awarded the contract. If we put the contracting officer back in the situation that he faced on April 1, 1952, with the benefit of the corrections made by the Appeals Board, he would also have had to consider some additional facts. He would, “in the best interests of the Government,” have had to consider when the Government would be likely to get the needed lighting sets if he should cancel Beam’s contract. In so doing he would have had to bear in mind (1) that Beam had already let subcontracts; (2) that the United States Rubber Company, the most promising prospect for producing a satisfactory cable for the lighting sets, had been working on the cable problem for months and was producing samples which were nearing success; and (3) that on February 26, 1952, a sample of the cable had been submitted for testing and the test results had been available to the contracting officer prior to April 1, 1952. The question for the contracting officer would, to say the least, have been a difficult one.
The Board of Contract Appeals in its opinion quotes one of the Government witnesses before the Board as saying that if the cable had been satisfactory
it is quite probable that no — the contract would not have been defaulted, because there would have been a possibility of the contract being completed.
To determine what the contracting officer would have done on April 1, 1952, if he had then known what he knew on November 27, 1953, would require pure speculation on our part. In fact, it seems that the termination was not in the best interests of the Government, since deliveries under the repurchase contracts were almost a year later than the dates agreed upon in those contracts.
The Government points, however, to paragraph 11(e) of the contract, which provides :
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault *18 of negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause.
This paragraph, by its terms, applies only when there has been a failure to perform which is found to be excusable. Compare Telco Electronics Co., A.S.B.C.A., No. 724, p. 23, 5 C.C.F. ¶ 61,294, p. 51,923 (1951). In this case, such failure to perform was not found. It would be anomalous indeed if the Government were entitled to breach its contract at will, and then escape the penalty for its breach by retroactively invoking a termination for convenience.
The Government relies on the case of College Point Boat Corporation v. United States, 267 U.S. 12, affirming 58 Ct. Cl. 380. In that case the Supreme Court held that the Act of June 15, 1917, 40 Stat. 182, as construed in Russell Motor Car Co. v. United States, 261 U.S. 514, gave to the President the unqualified and absolute right to cancel contracts for the building of ships. The statute provided that if a contract was canceled, just compensation should be made, as determined by the President, and that if the contractor was not satisfied with the President’s award, he could accept 75 percent of it and bring suit for such additional sum as would, when added to the amount received, constitute just compensation.
In the case before us, the Government had no such right to cancel the contract as it had under the 1917 statute. Its rights to terminate for default, or for the convenience of the Government, were expressly defined in the contract. The contract provision hereinabove quoted expressly provided that if the contractor was in default, and the contract was terminated for that default, and it was later determined that the default was excusable, the termination could be treated as a termination for the convenience of the Government. In the instant case the contractor was not in default. That was found by the Board of Contract Appeals, and its finding was well supported by evidence. The Government had, by its words and its conduct, extended the time for the per *19 formance of tbe contract, and until that extended time bad elapsed, tbe contractor was no more in default tban be was on tbe first day after tbe contract was made.
Wben one makes a contract with the Government, he of course takes tbe risk that tbe provisions of tbe contract, worked out by tbe Government in its long experience in tbe writing and administration of contracts, may work to bis disadvantage. But be does not, merely by signing a contract with tbe Government, award it a license to twist and warp one of the exculpatory provisions which it has written into the contract, and make it apply to a situation not covered by tbe provision as written. If tbe Government desires to do what tbe 1917 shipbuilding statute did, i.e., reserve tbe unqualified right to cancel contracts, and agree to pay just compensation for their cancellation, let it say so, as it did in 1917. In tbe instant case it did not reserve such a right to cancel, and, by tbe law of contracts, it bad, in tbe circumstances, no more right to cancel tban does any party to any contract.
The case has no resemblance to that of one who has terminated a contract for a stated reason, which turns out to be insupportable, but later discovers and relies on a valid reason for cancellation. In tbe instant case no valid reason for termination has ever been presented by tbe Government.
Tbe obiter statement of tbe Board of Contract Appeals that “tbe proper remedy was that of termination for the convenience of tbe Government, if termination was desired” is not entitled to weight. No- such contention was made to tbe Board by either party, and it would be wholly unfair to the Board to saddle it with tbe responsibility for a decision which is obviously wrong.
Tbe Government cites this court’s opinion in The Commonwealth Engineering Company v. United States, 148 Ct. Cl. 330, cert. denied 364 U.S. 820. In that case the plaintiff bad entered into a termination agreement, but later sued tbe Government asserting that tbe agreement was invalid because tbe Government bad used duress in obtaining the plaintiff’s consent to tbe agreement. The court held (1) that if tbe plaintiff was in fact in default, it was not duress for tbe Government to threaten to terminate the contract for default *20 if the plaintiff would not sign the tendered termination agreement and (2) that if the plaintiff was, as it alleged, not in default, the Government still had the right to terminate for convenience of the Government, under either article 11(e) or article 21(a) of the contract.
It will be observed that in Commonwealth Engineering the contracting officer terminated the contract for the convenience of the Government. He did not, as in the instant case, terminate it for another reason, and, more than a year later, attempt to place the termination on another ground more advantageous to the Government. Further, in the circumstances of that case, the contracting officer had the right, under article 21 (a) of the contract, which had nothing to do with default, to terminate the contract for the convenience of the Government, and could do so in good faith in view of the status of performance of the contract.
This court’s alternative observation that even if the contractor was not in default, the Government could terminate the contract for its convenience under article 11(e) of that contract, which was identical with article 11 (e) of the plaintiff’s contract, was, we think, erroneous. It would mean that the Government has an unqualified right to terminate every contract which contains a provision like that in article 11(e) and would impose upon contractors with the Government a risk which their contracts do not contemplate. This observation in Commonwealth Engineering was not necessary to the decision of the case.
Our conclusion is that the Government, having wrongfully terminated Beam’s contract, could not retroactively give that wrongful termination a different legal effect by changing the label which had been expressly and purposely attached to it when the termination occurred. The only purpose of the change of label was to diminish the amount of the damages which Beam might recover. That kind of saving is not what the contract contemplated in its words “in the best interests of the Government.”
The plaintiff is entitled to recover the damages caused to Beam by the wrongful termination of Beam’s contract. As in all such cases no exact computations can be made as to what the contractor’s costs would have been if it had been *21 permitted to perform the contract, and what profit it would have made. The plaintiff contends that he is entitled to recover $272,629.60, including $219,334.28 for lost profits. He argues that Beam would have incurred costs totaling $1,455,665.72 in performing contract 955, for which the contract price was $1,675,000. The costs as projected by the plaintiff include $1,192,263.29 in estimated costs of subcontracts, as indicated by prices included in purchase orders on all but two of the subcontracts. For the two subcontracts for which the purchase orders contained no price, the plaintiff estimated prices totaling $600,795. In addition to subcontract costs, the plaintiff included other costs totaling $263,402.43, representing estimated packaging, labor, overhead, freight, shrinkage and general and administrative expenses. We cannot calculate with any pretense of exactitude the costs which the plaintiff would have incurred, and in view of the various uncertain aspects in at least $860,000 of the costs as presented by the plaintiff, we think that, under the circumstances, $1,495,000 represents a reasonable estimate of the plaintiff’s costs. This yields a profit loss of $180,000.
We conclude, therefore, that the plaintiff’s recoverable damages are $180,000 in lost profit and $69,347.33 in costs, or a total of $249,347.33. Partial payments made by the defendant totaled $16,052.01, so the plaintiff is entitled to recover $233,295.32.
The Government urges that some of the findings of the Board of Contract Appeals were not supported by substantial evidence, and that it may, under the Wunderlich Act, 41 U.S.C. § 321, and upon the basis of this court’s decision in Volentine and Littleton v. United States, 136 Ct. Cl. 638, attack them. We assume, without deciding, that the Government is as free as its adversary to resort to the statute, and to the judicial doctrine referred to. But we.do not find that any of the Board’s findings were not supported by substantial evidence, even when the evidence produced at the trial in this court, and which the Board did not have before it, is placed upon the scale. The only item which seems questionable to us is the Board’s finding that the cable sample submitted on February 26,1952, complied with the specifications *22 of the contract. At the hearing before the Board, this fact was testified to by Mr. Krauss and was conceded by Government counsel. In the trial before the commissioner of this court, the Government presented laboratory tests and the testimony of laboratory technicians tending to show that while the February 26 sample complied with the low temperature test, it failed to meet other requirements and was not acceptable. It will be remembered that the problem which had seemed almost insoluble was the low temperature problem. When that was solved, it would seem that success was at hand. This occurred in 1952. The trial before the Board was in 1953, and the evidence was that the test was successful. But in 1957 and 1958, in the hearing before our commissioner, although Krauss again testified that the sample had been approved, the Government’s technician testified that there were defects in the sample not relating to low temperature. It would seem that when any obj ect is subjected to a severe laboratory test it will be found to be in some respect less than perfect. Whether the imperfections pointed out years after the tests would have been regarded by the Board as material, we do not know. In this situation, we do not find that the Board’s finding was not supported by substantial evidence.
THE DEFENDANT’S THIRD COUNTERCLAIM
As appears earlier in this opinion, Beam had another contract with the Government, contract 7939, which was in the course of performance during the events relating to contract 955 on which the plaintiff sues. In connection with contract 7939, Beam awarded a subcontract to Murakami and Sons, Inc. for the furnishing by Murakami of the chests for the floodlights which were the subject of contract 7939. The subcontract price was $29.50 per chest. Thereafter an agent of Beam increased the subcontract price to $69.50 per chest. Murakami billed Beam for $34,750 for 500 chests at $69.50 per chest. Beam presented this invoice to the Government and received a partial payment of $26,062.50, i.e., 75 percent of the amount of the invoice. Ultimately Beam paid Murakami only $29.50 apiece for the chests. At that price, Murakami’s bill to Beam would have been $14,750, and a *23 partial payment of 75 percent thereof would have been $11,062.50.
Contract 7939 was completed by Beam and Beam was paid the contract price by the Government. The Murakami maneuver resulted in no loss to the Government except the loss of the use of the excess $15,000 of partial payment money for the short period between the time of partial payment and the time the excess was recouped by the Government.
The False Claims Act, 31 U.S.C. § 231, provides that anyone knowingly making a false claim against the United States should forfeit and pay to the United States the sum of $2,000, and double the amount of damages sustained by the United States by reason of the false claim. Evidence of fraud must be clear and convincing. While it does appear that the Murakami invoices were padded, the purpose of the padding was not proved. The testimony of the witness Murakami was so confused that it is unintelligible. A finding of fraud or of a false claim within the meaning of the statute could not possibly be based upon it.
Defendant also alleged fraud in connection with Beam’s receipt of partial payment based on an invoice from Harrison Iron Works, which invoice was not paid by Beam, and was canceled by Harrison after partial payment had been made. It appears from the evidence that a salesman of Beam’s had been aware that Harrison expected advance payment for the items covered by its invoice, but it is not shown that Beam officials had any knowledge of this problem, which eventually led to cancellation of the purchase order to Harrison. There is no evidence that the Harrison invoice was fraudulently presented in order to obtain partial payment, and Beam’s failure to return that payment after cancellation of the Harrison order does not constitute fraud. Beam did not conceal the cancellation, and the Government was free to deduct the amount of partial payment from future payments to Beam, as it saw fit. The amount of partial payment involved was $1,886.25.
Although no fraud has been shown to have been involved in the Murakami transaction, Beam’s actions did result in securing a payment from the Government to which it was not entitled under the contract. As a result, the Govern *24 ment lost the use of $15,000 for a period of nine months. The Government is therefore entitled to recover interest at the rate of G% per annum on that amount, or a total of $675, on its third counterclaim. The Government’s first and second counterclaims will be dismissed.
The plaintiff is entitled to recover $233,295.32 for the breach of its contract. Therefore, the plaintiff’s net recovery will be $232,620.32 and judgment will be entered in that amount.
It is so ordered.