Davis, Judge,
delivered the opinion of the conrt:
In the fall of 1956 plaintiff, a well-known Oklahoma lawyer, made two contracts with the Corps of Engineers to furnish certificates of title and title insurance on tracts in certain Oklahoma counties acquired by the Federal Government for use in two dam-and-reservoir projects. Compensation was measured, at a fixed rate, by the number of certificates completed. The agreements ran until June 30,1961, but the defendant could end them on June 30th of any prior year by failing to give written notice of renewal. This option of renewal was exercised each year through June 30, 1960, but not for the following year.
Plaintiff does not complain about the defendant’s actions under the contracts during the years which ended on June 30th of 1957,1958, and 1959. His charge is that, during the last year (1959-1960), the Government breached the agreements — which in his view bound the defendant to order all of its certificate and insurance requirements for the specified lands from plaintiff — by obtaining some certificates and insurance from another source. He argues that, although the contracts did not expressly obligate the defendant to purchase all of its requirements from him, that was the clear aim of the detailed contractual provisions specifying what he and the Government were to do. The defendant contends, on the other hand, that from their inception the agreements were not “requirements” but pure “indefinite quantities” agreements, and that in any event plaintiff understood and impliedly agreed, as a result of discussions preceding the Government’s exercise of its renewal option for the year ending June 30, 1960, that during that last period the Corps of Engineers would turn to other suppliers for some of its needs for title certificates and title insurance for the tracts involved in the two projects. This latter argument plaintiff counters by saying that the ultimate contract he was tendered and *669 signed for 1959-1960 was, in its significant aspects, exactly the same as the agreements for the prior years and he therefore assumed, reasonably, that the Government had withdrawn its request to be allowed to go elsewhere for part of its requirements.
We need not resolve any of these disputed questions. For the purposes of our determination we can assume, without deciding, that the contracts obligated the Government at all times, including the last year, to give all of its orders for title certificates and insurance (in the specified counties) to plaintiff. Even so, there was in each contract a standard termination clause providing that “the performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the contracting officer shall determine that such termination is in the best interests of the Government” (finding 8, emphasis added).. The defendant did not invoke this clause as it could have (see footnote 3, infra), but instead acted on the assumption (which plaintiff now challenges) that the contracts were not “requirements” but “indefinite quantities” agreements, allowing the Government to order elsewhere at will.[1] In comparable circumstances we have held that the failure of the defendant to invoke the convenience-termination article makes no difference, and that that clause nevertheless sets the limit to any possible recovery. John Reiner & Co. v. United States, 163 Ct. Cl. 381, 325 F. 2d 438 (1963), cert. denied, 377 U.S. 931 (1964); Brown & Son Electric Co. v. United States, 163 Ct. Cl. 465, 325 F. 2d 446 (1963). Cf. Goldwasser v. United States, 163 Ct. Cl. 450, 325 F. 2d 722 (1963).
In Reiner and Brown Electric, the Government canceled the contracts, not under the termination article but because the Comptroller General had ruled them illegal. We held the contracts lawful but restricted the contractors to the amounts recoverable under the termination clause since that provision could properly have been invoked by the contracting officer. The justifications actually given for the cancellations were not valid, but “a good ground did exist” for ending *670 the contractors’ performance “in the far-reaching right to terminate under the termination article.” John Berner & Co., supra, 163 Ct. Cl. at 392, 325 F. 2d at 413. That adequate cause for cancellation cured the defective reason which prompted the defendant to act. A party to a contract may “justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.” College Point Boat Corp. v. United States, 267 U.S. 12, 16 (1925).[2]
The same principle applies here. Even though the two contracts be read to call upon the Government to fill all of its requirements through plaintiff’s services, it cannot be denied that the Government had also reserved the right to terminate plaintiff’s performance, either wholly or partially. If the contracting officer had accepted the agreements as “requirements” contracts, he could still have satisfied his desire to place some orders elsewhere by invoking the right of partial termination, “from time to time” if necessary, under the convenience-termination article.[3] It follows that, even on plaintiff’s view of the nature of the contracts, there was justifiable cause — the right to terminate — for what the defendant did. That justifiable cause “operate[s] to curtail the damages recoverable” to those allowable upon a termination. See College Point Boat Corp. v. United States, supra, 267 U.S. at 16.
*671 On a termination, plaintiff would be entitled, in general, to the unreimbursed costs of performance, but would have no claim to anticipated but unearned profits. G. L. Christian & Associates v. United States, 160 Ct. Cl. 1, 11, 15-17, 312 F. 2d 418, 423, 426-27, cert. denied, 375 U.S. 954 (1963); J. W. Bateson Co. v. United States, 162 Ct. Cl. 566, 568-569 (1963); Brown & Son Electric Co. v. United States, supra, 163 Ct. Cl. at 472, 325 F. 2d at 450; Litchfield Mfg. Corp. v. United States, supra, 167 Ct. Cl. at pp. 608-09 (incl. fn. 9), 613, 338 F. 2d at 96-97, 99. The barrier plaintiff cannot hurdle is that he has not proved, or sought to prove, any such unreimbursed costs. Apparently, in performing under these contracts, he employed, from time to time, clerical assistance and lawyers who were paid hourly, per piece, or on some other similar basis so that when defendant decreased its orders to him in the latter part of the year 1959-1960 he could cut his expenses proportionately and did not continue to bear unreimbursed costs allocable to these government contracts.[4] His sole claim is for the profit he would have made if all of the Government’s orders for 1959-1960 had been routed to him. That is a type of recovery to which he would clearly not be entitled on a convenience termination and, accordingly, to which he now has no right. Since he seeks nothing else, he cannot have any judgment.
The plaintiff is not entitled to recover and his petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States, a resident of the State of Oklahoma, a lawyer and member of the bar of that state and a competent title attorney.
2. On November 29, 1956, plaintiff and defendant entered into a contract, No. DA-066-CIVENG-57-326, under the terms of which plaintiff was to furnish certificates of title *672 and title insurance at a fixed rate of compensation on tracts of land in McIntosh County, Oklahoma, acquired by defendant for use in the construction of the Eufaula Dam and Reservoir project. The over-all term of the contract ran to June 30,1961, but the contract was on a fiscal-year basis and would have terminated June 30, 1957, or on any subsequent June 30th of a fiscal year unless renewed by written notice to that effect by defendant exclusively at its option. This contract hereafter will be referred to as the Eufaula contract.
3. On December 4, 1956, plaintiff and defendant entered into contract No. DA-34-066-CIVENG-57-329 under the terms of which plaintiff was to furnish certificates of title and title insurance at fixed rates of compensation on tracts of land in Creek, Osage and Pawnee Counties, Oklahoma, acquired by defendant for use in construction of the Keystone Dam and Reservoir project. The over-all term of this contract ran to June 30,1961, but it was on a fiscal-year basis and would have terminated June 30,1957, or any subsequent June 30th of a fiscal year unless renewed by written notice to that effect by defendant exclusively at its option. This will be referred to as the Keystone contract.
The Eufaula and the Keystone contracts were both renewed and extended in their original form for the fiscal years 1958 and 1959.
4. This is a suit for damages for alleged breach of the Eufaula and Keystone contracts by defendant. Plaintiff contends that under these contracts he was bound to furnish and defendant was bound to order from plaintiff all of the Government’s requirements for title certificates and title insurance provided for in the agreements. Defendant allegedly breached these contracts during the fiscal year 1960, the last year in which they remained in force, by ordering some certificates and insurance from a supplier other than plaintiff. There was nothing in either contract by express language which obligated the defendant to purchase all of its requirements from plaintiff. Plaintiff alleges, however, that this was the clear intent of the language imposing express and detailed obligations on plaintiff.
5. The two contracts, on government bid forms, are identical in form and the only difference between them is to be *673 found in the continuation sheets. Thus, the Keystone contract provides different rates of charge per preliminary certificate ordered in Creek ($63.50), Osage ($34.50), and Pawnee ($47.50) Counties and the Eufaula contract provides yet another rate ($49.50) for a preliminary certificate in McIntosh County. Continuation title certificates are $5 in all instances. Insurance rates are the same under both contracts. The bid form required the contractor “to furnish any and all of the items upon which the prices are quoted at the price set opposite each item.”
The total consideration for the Eufaula contract was stated th be approximately $104,000 and for the Keystone contract $149,937. These sums were arrived at by multiplying plaintiff’s bid figures for the certificates and insurance by the total estimated ownerships shown on the continuation sheets. Estimated ownerships as shown in the contracts are set forth in the next finding.
6. The contract specifications provided, in part:
3. Delivery:
Certificates of title shall be completed and actually delivered to the party designated in the order. Deliveries shall be made in the order requested and at the rate of not less than five (5) certificates of title per week, pro- ■ vided orders for not less than that number; are received weekly. The first delivery shall be made thirty (30) days from the date of the first order. It is anticipated the following number of certificates will be required from the counties and during the Fiscal Year indicated:
For the Keystone contract the estimates were:

*674 Subparagraph 2 of section I of the general specifications warns that the contracting officer may reduce or increase the total number of certificates of title to be ordered and delivered.
7. The general provisions of the contracts contained the following paragraphs:
11. Default
(a) The Government may * * * by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
* * if: *
(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.
The default provisions of the contracts were not invoked by defendant.
8. Paragraph 24 of the general provisions of the contracts stated in part:
24. TERMINATION FOR CONVENIENCE OF THE GOVERNMENT
(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the contracting officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the *675 contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.
(b) After receipt of a Notice of Termination, and except as otherwise directed by the contracting officer, the contractor shall (1) stop work under the contract on the date and to the extent specified in the Notice of Termination; (2) place no further orders or subcontracts for materials, services, or facilities except as may be necessary for completion of such portion of the work under the contract as is not terminated; (3) Terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the Notice of Termination; (4) assign to the Government, in the manner, at the times, and to the extent directed by the contracting officer, all of the right, title, and interest of the contractor under the orders and subcontracts so terminated, in which case the Government shall have the right, in its discretion, to settle or pay any or all claims arising out of the termination of such orders and subcontracts; (5) settle all outstanding liabilities and all claims arising out of such termination or orders and subcontracts, with the approval or ratification of the contracting officer, to the extent he may require, which approval or ratification shall be final for all the purposes of this clause; (6) transfer title and deliver to the Government, in the manner, at the times, and to the extent, if any, directed by the contracting officer, (i) the fabricated or unfabricated parts, work in process, completed work supplies, and other material produced as a part of, or acquired in connection with the performance of, the work terminated by the Notice of Termination, and (ii) the completed or partially completed plans, drawings, information, and other property which, if the contract had been completed, would have been required to be furnished to the Government; (7) use its best efforts to sell, in the manner, at the times, to the extent, and at the price or prices directed or authorized by the contracting officer, any property of the types referred to in provision (6) of this paragraph, provided, however, that the contractor (i) shall not be required to extend credit to any purchaser, and (ii) may acquire any such property under the conditions prescribed by and at a price or prices approved by the contracting officer; and provided further, that the proceeds of any such transfer or disposition shall be made by contract or be applied m reduction of any payments to the Government to the contractor under this *676 shall otherwise be credited to the price or cost of the work covered by this contract or paid in such other manner as the contracting officer may direct; (8) complete performance of such part of the work as shall not have been terminated by the Notice of Termination and (9) take such action as may be necessary, or as the contracting officer may direct, for the protection and preservation of the property related to this contract which is in the possession of the contractor and in which the Government has or may acquire an interest. At any time after expiration of the plant clearance period, as defined in ’Section VIII, Armed Services Procurement Regulation, as it may be amended from time to time, the contractor may submit to the contracting officer a list, certified as to quantity and quality, of any or all items of termination inventory not previously disposed of, exclusive of items the disposition of which has been directed or authorized by the contracting officer, and may request the Government to remove such items or enter into a storage agreement covering them. Not later than fifteen (15) days thereafter, the Government will accept title to such items and remove them or enter into a storage agreement covering the same, provided, that the list submitted shall be subject to verification by the contracting officer upon removal of the items, or if the items are stored, within forty-five (45) days from the date of submission of the list, and any necessary adjustment to correct the list as submitted shall be made prior to final settlement.
(c) After receipt of a Notice of Termination, the contractor shall submit to the contracting officer its termination claim, in the form and with the certification prescribed by the contracting officer. Such claim shall be submitted promptly but in no event later than two years from the effective date of termination, unless one or more extensions in writing are granted by the contracting officer, upon request of the contractor made in writing within such two-year period or authorized extension thereof. However, if the contracting officer determines that the facts justify such action, he may receive and act upon any such termination claim at any time after such two-year period or any extension thereof. Upon failure of the contractor to submit its termination claim within the time allowed, the contracting officer may determine, on the basis of information available to him, the amount, if any, due to the contractor by reason of the termination and shall thereupon pay to the contractor the amount so determined.
*677 (d) Subject to the provisions of paragraph (c), the contractor and the contracting officer may agree upon the whole or any part of the amount or amounts to be paid to the contractor by reason of the total or partial termination of work pursuant to this clause, which amount or amounts may include a reasonable allowance for profit on work done. The contract shall be amended accordingly? and the contractor shall be paid the agreed amount. Nothing in paragraph (e) of this clause, prescribing the amount to be paid to the contractor in the evént of failure of the contractor and the contracting officer to agree upon the whole amount to be paid to the contractor by reason of the termination of work pursuant to this clause, shall be deemed to limit, restrict, or otherwise determine or affect the amount which may be agreed upon to be paid to the contractor pursuant to this paragraph (d).
(e) In the event of the failure of the contractor and contracting officer to agree as provided in paragraph (d) upon the whole amount to be paid to the contractor by reason of the termination of work pursuant to this clause, the contracting officer shall determine, on the basis of information available to him, the amount, if any, due to the contractor by reason of the termination and shall pay to the contractor the amounts determined as follows:
(1) For completed supplies accepted by the Government (or sold or acquired as provided in paragraph (b) (7) above) and not theretofore paid for, a sum equivalent to the aggregate price for such supplies computed in accordance with the price or prices specified in the contract, appropriately adjusted for any saving of freight or other charges; (2) the total of—
(i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but exclusive of any costs attributable to supplies paid or to be paid for under paragraph (e) (1) hereof.
(ii) The cost of settling and paying claims arising out of the termination of work under subcontracts or orders, as provided in paragraph (b) (5) above, which are properly chargeable to the terminated portion of the contract (exclusive of amounts paid or payable on account of supplies or materials delivered to services furnished by subcontractors or vendors prior to the effective date of the Notice of Termination, which amounts shall be included in the costs payable under (i) above).
(iii) A sum equal to 2% of that part of the amount determined under (i) which represents the cost of arti- *678 oles and materials not processed by the contractor, plus a sum equal to 8% of the remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under subdivision _(i) above, which amount for the purpose of this subdivision (iii) shall exclude any charges for interest on borrowings ; provided, however, that if it appears that the contractor would have sustained a loss on the entire contract had it been completed, no profit shall be included or allowed under this subdivision (iii) and an appropriate adjustment shall be made reducing the amount of the settlement to reflect the indicated rate of loss.
(2) The reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims and supporting data with respect to the terminated portion of the contract and for the termination and settlement of subcontracts thereunder, together with reasonable storage, transportation, and other costs incurred in connection with the protection or disposition of property allocable to this contract.
(3) The sum to be paid to the contractor under (1) and (2) of this paragraph (e) shall not exceed the total contract price as reduced by the amount of payments otherwise made and as further reduced by the contract price of work not terminated. Except for normal spoilage, and except to the extent that the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the contractor as provided in paragraph (e) (1) and paragraph (e)(2) (i), the fair value, as determined by the contracting officer, of property which is destroyed, lost, stolen, or damaged so as to become undeliverable to the Government, or to a buyer pursuant to paragraph (b) (7).
(f) Any determination of costs under paragraph (c) or (e) hereof shall be governed by the Statement of Principles for Consideration of Costs set forth in Part 4 of Section VIII of the Armed Services Procurement Regulation, as in effect on the date of this contract.
(g) The contractor shall have the right of appeal, under the clause of this contract entitled “Disputes”, from any determination made by the contracting officer under paragraphs (c) or (e) above, except that if tihe •contractor has failed to submit its claim within the time provided in paragraph (c) above and has failed to request extension of such time, he shall have no such right *679 of appeal. In any case where the contracting officer has made a determination of the amount due under paragraph (c) or (e) above, the Government shall pay to the contractor the following: (i) if there is no right of appeal hereunder or if no timely appeal has been taken, the amount so determined by the contracting officer, or (ii) if an appeal has been taken, the amount finally determined on such appeal.
(h) In arriving at the amount due the contractor under this clause there shall be deducted (1) all un-liquidated advance on other unliquidated payments on account theretofore made to the contractor, (2) any claim which the Government may have against the contractor in connection with this contract, and (3) the agreed price for, or the proceeds of sale of, any materials, supplies, or other things acquired by the contractor or sold, pursuant to the provisions of this clause, and not otherwise recovered by or credited to the Government.
(i) If the termination hereunder be partial, prior to the settlement of the terminated portion of this contract, the contractor may file with the contracting officer a request in writing for an equitable adjustment of the price or prices specified in the contract relating to the continued portion of the contract (the portion not terminated by the Notice of Termination), and such equitable adjustment as may be agreed upon shall be made in such price or prices.
(j) The Government may from time to time, under such terms and conditions as it may prescribe, make partial payments and payments on account against costs incurred by the contractor in connection with the terminated portion of this contract whenever in the opinion of the contracting officer the aggregate of such payments shall be within the amount to which the contractor will be entitled hereunder. If the total of such payments is in excess of the amount finally agreed or determined to be due under this clause, such excess shall be payable by the contractor to the Government upon demand, together with interest computed at the rate of 6% per annum, for the period from the date such excess payment is received by the contractor to the date on which such excess is repaid to the Government; provided, however, that no interest shall be charged with respect to any such excess payment attributable to a reduction in the contractor’s claim by reason of retention or other disposition of *680 termination inventory until 10 days after the date of such retention or disposition.
(k) Unless otherwise provided for in this contract, or by applicable statute, the contractor, from the effective date of termination and for a period of six years after final settlements under this contract, shall preserve and make available to the Government at all reasonable times, at the office of the contractor but without direct charge to the Government, all its books, records, documents, and other evidence bearing on the costs and expenses of the contractor under this contract and relating to the work terminated hereunder, or, to the extent ap- • proved by the contracting officer, photographs, micro-photographs, or other authentic reproductions thereof.
The defendant did not invoke the above provisions of the contracts.
9. The certificates furnished by plaintiff were preliminary certificates, revised preliminary certificates, continuation certificates, final certificates and, occasionally, post-final certificates.
Preliminary certificates set forth the current ownership of a given tract, the encumbrances affecting the tract and the requirements for removal of any clouds or defects in the title. An insurance binder was issued with the preliminary certificate guaranteeing that plaintiff’s insurance company would insure the property at its actual value once properly acquired by the Government.
Eevised preliminary certificates were issued in situations where the Government, having ascertained that the tract for which the original preliminary certificate was issued was too large or too small, required a revised description.
Continuation certificates were furnished on order of the Government when considerable time had elapsed since the date of issuance of the preliminary certificate and when its current status had to be known.
Final certificates were usually furnished after the Government had acquired title by purchase of a tract or had filed declaration of taking and instituted condemnation action. These certificates verified that all title requirements in the preliminary and continuation certificates had been met and that the title was free and clear of exceptions. This involved *681 a title re-examination from the date of the last certificate down to date.
Post-final certificates were issued in those cases where the final certificates did not show the title free of requirements and where further steps had to be taken to clear any remaining objections to the title.
10. As a basis for preparation of title certificates it was necessary to make an examination of title records maintained in the office of the county clerk in each county where the land was located and to examine the tax records in the office of the county treasurer and the judgment records in the office of the court clerk. Sometimes plaintiff employed competent assistance, but at all times reserved to himself the approval in final form of the preliminary title certificates submitted to defendant. On request plaintiff also furnished defendant information as to whether proposed curative material, which was being obtained by defendant to correct title defects he had previously noted, would be adequate as a basis for subsequent issuance of a final, post-final or continuation certificate.
11. Through the fiscal year 1959 defendant ordered- from plaintiff all of its title-certificate and title-insurance requirements in McIntosh County with reference to the Eufaula Eeservoir project and all of its requirements with reference to tracts of land in Creek, Osage and Pawnee Counties in connection with the Keystone project. In fiscal 1958 and 1959, under a T.O.D. (tract ownership data) contract, plaintiff furnished defendant certain supplemental services concerning tract descriptions. Plaintiff also had contracts with defendant, similar in form and purpose to the Keystone and Eufaula- contracts, for furnishing title certificates and insurance in Eogers County for the Oologah Eeservoir project and for the extension of Fort Sill in Comanche County. The latter two contracts extended into fiscal year 1960 and had a bearing on plaintiff’s capacity to perform the agreements here in issue during fiscal year 1960.
12. During the last half of the fiscal year 1959 defendant increased its rate and size of orders for preliminary title certificates and other title material in comparison with the *682 rate of orders during the previous contract period. Orders were now in segments of 25 to 100 and plaintiff began to build a considerable backlog of unfilled orders, although continuing to meet the minimum guarantee of five deliveries per week where orders were sufficient to require that rate. During this period plaintiff’s deliveries were between .452 and 14.8 per week under the Keystone contract and between 6.1 and 18.4 per week under the Eufaula contract. Some delay in deliveries was occasioned, which increased the backlog, because of defendant’s instructions to plaintiff to give certain tract orders priority. Plaintiff’s responsibilities in connection with other contracts mentioned in the finding above also had some effect in creating the backlog under the contracts in issue. Further, plaintiff was experiencing some difficulty in connection with the examination of very complex titles in Creek County where mineral ownership and oil and gas leasehold interests had involved many conveyances or transfers.
13. In the latter part of fiscal year 1959 discussions and negotiations occurred between plaintiff and representatives of defendant about the growing backlog of unfilled orders. Negotiations were conducted primarily between plaintiff and Mr. David A. Helms, Chief of the Real Estate Division, U.S. Army Engineers, Tulsa, Oklahoma, representing defendant. Defendant desired that the contracts be changed to provide a guaranteed minimum rate of 30 instead of 5 per week in fiscal year 1960.
14. On June 16, 1959, Mr. Helms and his associate, Mr. Darwin L. Wilder, Chief of the Acquisition Branch, U.S. Army Engineers, Tulsa, met with plaintiff for the purpose of negotiating renewal of the Keystone and Eufaula contracts. At this conference the issues discussed were (a) renewal of the contracts; (b) an increase in the number of certificates to be furnished thereunder; (c) a time schedule for delivery of continuation and final certificates; and (d) a provision for means and a method for payment of insurance premiums on continuation certificates for those tracts of land acquired by condemnation.
15. Plaintiff objected to changing the agreements to provide a guaranteed minimum rate of 30 instead of 5 certificates *683 per week under each contract, as such a change would involve increased overhead. Plaintiff indicated he would expect and require an additional price per tract under such a contract change. Plaintiff indicated also that he expected to be able to meet a rate of approximately 30 per week under existing contracts when the T.O.D. contracts were completed and the difficult oil titles were out of the way.
16. Defendant’s representative informed plaintiff that defendant’s requirements were not being met under the contracts, that defendant estimated those requirements were 30 to 40 certificates per week, that while plaintiff was producing above the minimum requirements specified by the contracts plaintiff was delinquent on orders placed, and that it was defendant’s intention to let the contracts lapse if plaintiff would not agree to an increase in the minimum rate as noted above. Defendant could not agree to any additional payments to plaintiff under the contracts for “expediting” deliveries. Plaintiff would not agree to defendant’s suggested change without an increased price per unit.
17. Plaintiff agreed to an increase in his minimum guaranteed deliveries to 10 certificates per week per contract but defendant’s representative told him that in order to fill defendant’s requirements it would have to let bids to other suppliers. There is a conflict in the evidence as to whether plaintiff then asked leave to submit such bids or warned defendant that, in his opinion, it was breaching the contracts. At any event, plaintiff did not submit such bids and does assert a breach. Plaintiff advised defendant that he would continue to try to furnish defendant’s requirements in excess of the minimum guarantee but would not contract to raise that guarantee when he did not think he could meet it without more compensation to obtain additional assistance.
18. Other matters were discussed at the conference on June 16, 1959, as noted in finding 14. As a result of negotiations, supplemental agreements were entered into, each bearing the date of June 23,1959, and they were attached to the Keystone and Eufaula contracts as modifications thereof. In sub *684 stance, the modifications, which are identical under each contract, provide that:
(a) Delivery of certificates of title would be made in the order requested and at the rate of not less than 10 per week, provided orders for not less than that number were received. This increase in the minimum guaranteed delivery was without additional compensation to plaintiff.
(b) Continuation certificates in various forms would be made by plaintiff within 45 days from date of order.
(c) Compensation for additional insurance premiums on continuation certificates of title would be paid on ownerships, which were placed in condemnation on a basis of the money deposited in condemnation proceedings, with additional insurance premiums to be paid on delivery of a final certificate in cases where a deficiency judgment was rendered.
(d) The supplemental agreements constituted an extension of the contract to and including June 30, 1960.
19. At the beginning of fiscal year 1960 plaintiff had a substantial number of orders for preliminary certificates on hand under both the Keystone and Eufaula contracts. Thereafter, in the latter part of the calendar year 1959, plaintiff received one or two additional large segment orders under the Keystone contract.
Under the Eufaula contract plaintiff received regular orders in segments of between 25 and 75 through the fall of 1959 and spring of 1960. He received virtually no orders under the Keystone contract during the last 6 months of fiscal year 1960 and very few under the Eufaula contract in the last quarter of fiscal year 1960.
20. During fiscal year 1960 plaintiff delivered under the Keystone contract the following preliminary certificates:
Osage County_ 26
Creek County_ 122
Pawnee County_ 407
555
In fiscal year 1960 plaintiff delivered 747 preliminary certificates under the Eufaula contract.
21.In the fiscal year 1960 plaintiff delivered preliminary certificates under each of the two contracts here involved in *685 accordance with orders received from defendant at the monthly and weekly rates set forth in the table below:

22. Plaintiff’s full time was not devoted to the performance of the contracts in issue, as noted in finding 11. He was also engaged in the private practice of law, largely on a contingent-fee basis. He estimated that, during the period when he had a peak load of Government business under the contracts, he devoted about 50 percent of his time to private practice. In fiscal year 1960 plaintiff estimated that due to the decline in orders under the contracts, they required only about 25 percent of his time and that 75 percent of his time was devoted to private practice. His private practice was described as “flexible” and of a nature that permitted him to devote as little or as much time to it as he preferred. This circumstance thus had a bearing on his manner of handling defendant’s contract work. On occasion he did all such work himself. At other times he used clerical assistance and on other occasions he employed lawyers to make independent examinations, subj ect to his approval. Clerical help was paid on a cash basis and other lawyers were paid 50 percent of plaintiff’s contract rate. Plaintiff also had out-of-pocket expenses for travel and certain office overhead later referred to herein.
23. On August 14,1959, defendant entered into the following contracts with the Title Insurance Corporation of St. Louis:
*686 (a.) Contract No. DA-34-066-CIVENG-60-39 requiring the furnishing of title certificates and title insurance for approximately 500 tract-ownerships of land situated in Osage County in connection with the Keystone Eeservoir on a form similar to plaintiff’s contracts. These certificates were estimated to cover land-acquisition cost to the Government of about $1,500,000.
(b) Contract No. DA-34-066-CIVENG-60-41 for certificates of title and insurance on approximately 400 ownerships of land in Creek County, Oklahoma, in connection with the Keystone project, based on an estimated land-acquisition cost to the Government of approximately $1,000,000.
(c) Contract No. DA-34-066-CIVENG-60-42 for the furnishing of such material on approximately 500 ownerships of land situated in Pawnee County, Oklahoma, in connection with the Keystone project, based on estimated land-acquisition cost to the Government of approximately $1,700,000.
(d) Contract No. DA-34-066-CIVENG-60-40 for the furnishing of such material on approximately 1000 ownerships of land in McIntosh County in connection with the Eufaula Eeservoir project.
24. Tabulated below are the certificates of all kinds ordered by defendant from the Title Insurance Corporation of St. Louis on tracts of land in Creek, Pawnee and Osage Counties in connection with the Keystone project and on tracts in McIntosh County in connection with the Eufaula project. Also shown are the preliminary certificates which, after original order, were cancelled or deleted by defendant.

25. Plaintiff claims that the orders placed by defendant for title certificates and insurance with the Title Insurance *687 Corporation of St. Louis during fiscal year 1960 constitute a breach of his Keystone and Eufaula contracts, as amended June 23,1959. The “total requirements” of defendant, during the fiscal year 1960 in connection with the two projects, are represented by the total of such certificate material and insurance placed with the Title Insurance Corporation under the three contracts applicable to Osage, Creek and Pawnee Counties and under the contract the corporation had for the same year with defendant for McIntosh County on the Eufaula project, plus the certificate and title material furnished by plaintiff under his two contracts with defendant.
26. Had the orders placed with the Title Insurance Corporation been placed with plaintiff he was fully capable of supplying all deliveries thereunder, although this would have required additional assistance of a legal and clerical nature for which he would have had additional overhead.
27. Plaintiff has not proved, or sought to prove, that he suffered any unreimbursed costs as a result of the defendant’s actions under the two contracts during fiscal year 1960. Plaintiff has confined his claim to the profits he would have realized if he had been given the title work awarded to the Title Insurance Corporation. This sum he calculates at $46,497.73. The Trial Commissioner found that he would have realized a profit of $38,187.94 (a figure which the defendant accepts). In view of its disposition of the case, the court need not, and does not, resolve this issue.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover and the petition is therefore dismissed.

 There is no suggestion that defendant thought that, in 1959-1960, plaintiff was in default under the contracts, or that it acted on such an assumption.

 The court has applied a different rule where the defendant wrongly terminates the contract for the contractor’s default. See Klein v. United. States, 152 Ct. Cl. 8, 285 F. 2d 778 (1961); Goldwasser v. United States, supra (in which the majority of the court thought that the contract had been so terminated); Litchfield Mfg. Corp. v. United States, 167 Ct. Cl. 604, at p. 609, fn. 9, 338 F. 2d 94, 96; Date Constr. Co. v. United States, 168 Ct. Cl. 692, 721 (1964). The default rule is inapplicable here. See footnote 1, supra.

 The defendant was concerned about the backlog of its unfilled needs for title certificates and title insurance on the two projects (which was estimated to be between 30 and 40 certificates per week), and had discussed with plaintiff its demand for much greater production. Plaintiff, who did not devote full time to these contracts but had other government contracts and was also actively engaged in the private practice of law, refused to increase his minimum production as much as defendant asked, but did agree (for 1959-1960) to raise his minimum from 5 certificates a week to 10. This was still considerably less than defendant’s requirements. In these circumstances, the contracting officer would undoubtedly have had the power, under the termination article, to exercise the Government’s right to terminate the plaintiff’s full rights, in order to be free to place orders with other suppliers. John Reiner & Co., supra, 163 Ct. Cl. at 389-390, 325 F. 2d at 442-43.

 If plaintiff had obligated himself by hiring personnel or incurring overhead on a longer term basis, he could recover on partial termination such of those costs as remained unrecouped — assuming, of course, that his contract "was a “requirements” agreement.

 Average of Aug., Sept., Oct. 1959 — 53.3 per week.

 The six certificates classified as later deleted for Creek County were claimed by defendant to be so on thetbeorythatiforderedfrom plaintiff ratherthanfrom the Title Insurance Corporation they would have constituted an order for continuation certificates as distinguished from preliminary certificates.